## THE STATE v. LAWRENCE, Appellant.

### Division Two, December 9, 1903.

1. **School District:** PURCHASE OF BOOKS: LEGAL WARRANT. In order that the warrant of a school district for the purchase of books be legal, the directors must meet as a board, with one of their members as clerk, and as a body make the purchase, and order the warrant drawn as the statute requires, and all the transaction must be evidenced by the record of the board kept by the clerk.

2. ———: ———: ———: ATTEMPT TO DEFRAUD. To maintain the conviction of a defendant charged with an attempt to procure a school warrant by false representations to the directors, with intent to cheat and defraud, it must be conceded that the warrant secured was not a legal obligation against the district, for if the warrant actually secured was a legal one, then there could be no such thing as an attempt to secure it.

3. ———: ———: ———: ———: INSTRUCTION. It is not an attempt to cheat and defraud to obtain by false and fraudulent representations from the directors of a school district an illegal warrant. There can be no attempt to obtain a legal warrant from a school board which had no authority to issue a legal warrant for the purpose.

4. **False Representations:** ATTEMPT TO DEFRAUD: REPUGNANT INFORMATION. An information which charges that the defendant who attempted to sell books to a school district, represented that he was the agent of the State Superintendent of Public Schools and also of the State Board of Education to make the sale, is repugnant.

5. ———: ———: EVIDENCE. The fact that an agent represented to school directors that they were compelled by law to purchase certain library books, when there was no such law, furnishes its own reason why such representations were not calculated to deceive.

6. ———: ———: CONTRADICTORY INSTRUCTIONS. The court should not in plaintiff's instructions tell the jury that certain representations, if made, were criminal, and in defendant's instructions tell them that the same representations were not criminal.

7. ———: CRIMES: GENERAL RULES. However wicked the conduct of a defendant may be, before he can be convicted and sent to the penitentiary, there must be a clear, legal charge, supported by competent as well as sufficient evidence to authorize his conviction.

8. ———: EVIDENCE. The evidence showed that school directors contracted with defendant as the agent of a company to purchase certain books, and issued to him an illegal warrant therefor, and that the books were never delivered, and that if they had been delivered, there would have been no complaint. *Held*, that this evidence shows

that they did not buy the books simply because defendant represented that he was the agent of the State Board of Education and of the Superintendent of Public Schools in introducing the books, and, hence, the evidence is insufficient to support that charge in the indictment.

Appeal from Grundy Circuit Court.—*Hon. Paris C. Stepp,* Judge.

REVERSED.

*F. B. Ellis* and *C. A. Loomis* for appellant.

(1)   The court erred in admitting the evidence of C. D. Axtell, C. E. Banta and Ed Urton. They could not issue, nor attempt to issue, a valid school warrant separate and apart from each other. They might bind themselves, but could not bind the district. In order to issue a valid school warrant, the board must meet and their proceedings must be made a matter of record. If their acts are separate and apart from each other, their acts are void, and no warrant they might issue, or attempt to issue, could or did have any value. School District v. Smalley, 58 Mo. App. 658; Kane and Co. v. School District, 48 Mo. App. 414; Johnson v. School District, 67 Mo. 321. (2) School districts can not pledge the future credit of the district, nor contract a debt payable a year hence. That is just what they attempted to do in this case. This is in violation of section 12, article 10, of the Constitution of this State. Kane & Co. v. School Dist., supra; Bernard & Co. v. Knox County, 105 Mo. 382. (3) The directors of the school district did not purchase the goods because they relied on the representations that Lawrence was the agent of the State Board of Education, but they relied on his shipping the goods, or the Supplemental Book Company's agent, of which Tracey was manager. All the promises relied upon by the directors when they made the purchase, were to take place in the future. The essence of the crime of obtaining property by false

pretenses is, that the false pretense should be of a past event, of a fact having a present existence, and not of something to happen in the future, and that the prosecutor believed them to be true, and that confiding in the truth, parted with his money or property. State v. DeLay, 93 Mo. 102; State v. Evers, 49 Mo. 542; State v. Petty, 119 Mo. 425. (4) It is not every representation or false statement and pretense that is within the statute. The law is not to protect or guarantee a person against irrational and foolish contract. State v. Barbee, 136 Mo. 440; State v. Cameron, 117 Mo. 641. (5) Whatever crime was committed in this case, as shown by the evidence, was complete. The defendant could not be convicted for an attempt. R. S. 1899, sec. 2361; State v. Chumley, 67 Mo. 41; State v. Lacy, 111 Mo. 513; State v. White, 35 Mo. 500. (6) The school directors could not have been deceived by the statement of defendant to the effect that he was agent for the State Board of Education. In the first place, the school law does not allow the State Superintendent of Schools to act as agent for the sale of school supplies. This he is prohibited from doing, under a very severe penalty. Sec. 9859, R. S. 1899. (7) The fifth instruction on the part of the State is undoubtedly bad. It tells the jury that if the defendant obtained money on a warrant which was void, and the district paid the warrant, then he was guilty. As to whether or not a warrant is bad, is not a question of fact, it is a question of law. Yet the jury were told that if they believed it was void, they could convict the defendant. But the jury were never told by the court what a school board was required to do to issue a valid warrant. Cassel v. Campbell, 110 Mo. 558; State v. Clay, 100 Mo. 572; Horton v. Tyre, 140 Mo. 253.

State v. Lawrence.

*Edward C. Crow,* Attorney-General, and *Bruce Barnett* for the State.

(1) That the defendant made an attempt to obtain a valid school warrant clearly appears from the evidence. It would be absurd to contend that defendant was employing his fraudulent methods for the purpose of obtaining an invalid warrant. (2) Appellant makes the contention and cites authorities in support thereof, that the warrant obtained by defendant was not valid, and therefore nothing of value was obtained. We do not feel called upon to dispute his proposition in this case, for the reason that the conviction was on the first count, which charges an attempt to obtain by false pretenses a school warrant of the value of $37.50. Defendant, therefore, stands acquitted of the charge of obtaining anything of value, and this verdict of the jury cures any errors the court may have committed in giving instructions authorizing a conviction on those counts of the information, which charges that the defendant obtained a warrant of the value of $37.50 by false pretenses. This court will not consider errors in instructions pertaining to any offense except the one of which there was a conviction. State v. Pitts, 156 Mo. 247; State v. John W. Moore, 156 Mo. 212; State v. Andrew, 76 Mo. 104; State v. Wilson, 98 Mo. 440; State v. Talbot, 73 Mo. 347; State v. Smith, 80 Mo. 576; State v. Dunn, 80 Mo. 681; State v. Eaton, 75 Mo. 591; State v. Stockwell, 106 Mo. 36. (3) Appellant contends that the conviction can not stand, because being on the first count of the information it is of an attempt to commit an offense, when the defendant succeeded in doing all he attempted to do, namely, to get possession of the warrant. The answer to this is that the defendant attempted to get valid warrant and failed, succeeding only in procuring an invalid one, and the jury so found. Appellant can not complain of the conviction on the ground that it was

of an attempt instead of a successful commission, because he himself asked an instruction to that effect that the warrant obtained was invalid, and not a thing of value. While this instruction was refused by the court, it is to be presumed that it was because the court had already instructed the jury to exactly the same effect in instruction 10, given on the State's behalf. This instruction, authorizing the jury to find that the warrant was invalid and of no value, was followed up by the jury with a verdict that defendant had attempted to obtain a warrant of value, or in other words, had obtained an invalid or valueless one only, so that the court's instruction, together with the jury's verdict, show that defendant got what he asked for when he offered instruction 12. In other words, whatever errors the court may have committed, have been cured either by the jury or by the defendant. (4) (a) The fact that the directors of the school district may have relied partly on the defendant's statement that the books would be forwarded, does not alter the case, if they relied also on his false representations as to existing facts. State v. Vandenburg, 159 Mo. 230. (b) But the conviction being of an attempt only, it matters not whether the representations were relied upon or not.

FOX, J.—The defendant was tried at the November term, 1902, a the Grundy Circuit Court upon an information in four counts.

The conviction was upon the first count, which charged the defendant with an attempt to obtain by false representations and pretenses a school warrant of the value of $37.50 from incorporated School District Number Eight, Township Sixty-one, Range Twenty-three, in Marion township, Grundy county, Missouri, and from C. D. Axtell, C. E. Banta and Ed Urton, the directors thereof.

In another count of the information defendant was

charged with *obtaining* such school warrant by such false pretense.

The first count in the information, upon which defendant was convicted, omitting caption, is as follows:

"Comes now Hugh C. Smith, prosecuting attorney within and for Grundy county, Missouri, and on his oath of office informs the circuit court of Grundy county, Missouri, by this, his first amended information, that on or about the 26th day of January, A. D. 1901, at Grundy county, Missouri, one W. B. Lawrence, then and there being, then and there with the intent then and there unlawfully and feloniously to cheat and defraud, then and there unlawfully, knowingly, designedly and feloniously did falsely, fraudulently, designedly and feloniously represent, state and pretend to C. D. Axtell, C. E. Banta and Ed Urton, then and there being and constituting the duly elected, qualified and acting board of directors of School District Number Eight, Township Sixty-one and Sixty-two, Range Twenty-three, in Marion township, Grundy county, Missouri, a corporation organized and existing under the laws of the State of Missouri, of which said board of directors, C. D. Axtell was president, and C. E. Banta, clerk, that the said W. B. Lawrence was then and there the duly authorized agent of the educational department of the State of Missouri to introduce, sell, deliver and receive payment therefor a certain set of books, known and designated as supplementary reading and reference books, and being fifty volumes in number, to the various school districts of the State of Missouri, and that he was sent out by the educational department of the State of Missouri for the purpose of introducing and placing a set of said books in each of the school districts of the State of Missouri. That the fifty volumes of books that he was selling and introducing as aforesaid, had been selected by W. T. Carrington, State Superintendent of Public Schools for the State of Missouri, and approved by the State Board of

Education for the State of Missouri. That the said W. T. Carrington, State Superintendent of Public Schools of the State of Missouri, had recommended and urged the school districts all over the State of Missouri to buy said books. That the State Board of Education had made a contract with the Missouri Supplementary Book Company, to furnish to the various school districts of the State of Missouri said fifty volumes of books at very low prices for the purpose of introducing them in said school districts. That the sum of thirty-seven and fifty-hundredths dollars was said introductory price which had been agreed upon as aforesaid. That W. T. Carrington, State Superintendent of Public Schools for the State of Missouri, had made a contract with him, the said W. B. Lawrence to introduce these books in the various school districts of the State of Missouri and to sell said books to said school districts and to receive and collect the purchase price therefor. That the laws of the State of Missouri compelled each and every school board in the State of Missouri to purchase said books. And the said W. B. Lawrence by means and by use of the said false and fraudulent representations, statements and pretenses so made as aforesaid to the said C. D. Axtell, C. E. Banta and Ed Urton, then and there constituting the board of directors of said school district, then and there unlawfully, knowingly, willfully, designedly and feloniously, did attempt to obtain from said C. D. Axtell, C. E. Banta and Ed Urton, constituting the board of directors of said school district, a school warrant or order on the township treasurer of Marion township in Grundy county, Missouri, the township in which said school district was at said time and now is situated, in the sum of thirty-seven and fifty-hundredths dollars, of the value of thirty-seven and fifty-hundredths dollars of the property of the school district aforesaid, then and there being with intent then and there unlawfully, knowingly, designedly and feloniously to cheat and defraud; whereas, in truth

and in fact, the said W. B. Lawrence was not then and there the duly authorized agent of the educational department of the State of Missouri, to introduce, sell and deliver and receive payment therefor a certain set of books, known and designated as supplementary reading and reference books, as aforesaid, to the various school districts of the State of Missouri, and said W. B. Lawrence was not sent out by the educational department of the State of Missouri for the purpose of introducing and placing said books in each of the school districts of the State of Missouri, the said books had not been selected by said W. T. Carrington, State Superintendent of Public Schools of Missouri, said books had not been approved by the State Board of Education for the State of Missouri; the said W. T. Carrington, State Superintendent of Public Schools of Missouri, had not recommended and urged that the school districts all over the State of Missouri purchase said books; the Missouri State Board of Education had not made a contract with the Missouri Supplementary Book Company, with the said W. B. Lawrence or any other person to furnish said books to the various school districts of the State of Missouri, and had made no contract whatever with the said Missouri Supplementary Book Company nor with the said W. B. Lawrence; W. T. Carrington, State Superintendent of Public Schools of Missouri, had made no contract with said W. B. Lawrence to introduce said books into the various school districts of the State of Missouri, nor to sell said books to said school districts, nor to receive and collect the purchase price therefor; the said W. T. Carrington, State Superintendent of Public Schools of Missouri, had made no contract whatever with the said W. B. Lawrence; the laws of the State of Missouri did not compel said board of directors to purchase said books; there was no Missouri Supplementary Book Company; all of which the said W. B. Lawrence then and there well knew; against the peace and dignity of the State."

The evidence relied upon to support this conviction is that detailed by the school directors, Axtell, Urton and Banta, which, so far as pertinent to the offense charged, was substantially as follows:

*C. D. Axtell,* testified on the part of the State, as follows:

"I am forty years old; am a farmer; live at Dunlap, Grundy county, Missouri, in district No. 8, township 61, range 23. I was president of the school board at that time; Charley Banta was the secretary. I have been a member of the board for the last fifteen years; Ed Urton was the other director. I know the defendant; he is the large, fleshy man. The first time I ever saw him I was at my farm; he was with George Hubell at that time; that was about the 26th day of February, 1901; this was the same day of the transaction he is charged with here. He said his business was to introduce some books, library books for the various school districts. Mr. Banta stopped there a short time after they came. Mr. Urton was at home, so far as I know. Well, his business was, he said, to introduce a set of library books for the various school districts, and he said he would like to show me the books, that he had what he called a prospectus, or sample, whatever you may call it. He said he had been sent out by the educational department of Missouri, to introduce these books. Well, the books he had with him we examined. The books, he said, Mr. Carrington, the State Superintendent, had recommended these books to the various districts. The price of the books was thirty-seven dollars and a half. Well, he said the books was put out by the Missouri Supplementary Book Company, and Mr. Carrington approved of these books, and urged each and every school district should buy these books. He also said it was a finable offense if the district did not buy these books.

"Q.  (By the Prosecuting Attorney) : Is there any record of what was done, Mr. Axtell?  A.  No, sir.

"Q.  Tell the jury, if you can, whose signatures are attached to this instrument?  A.  Chas. Banta and myself."

Plaintiff introduced the following school warrant, marked "Exhibit A :"

"INCIDENTAL FUND.

"$37.50.                                    No. —— —— ——

"Treasurer of Marion township, Grundy county, Missouri :

"Pay to W. B. Lawrence, Jan. 1, 1902, or order, the sum of thirty-seven and 50-100 dollars, for 50 Vol. Supplementary Books furnished District No. 8, Township 61 and 62, Range 23, out any funds in your hands for the payment of incidental expenses, belonging to said district.

"Done by order of the Board, this 26th day of Jan. 1901.                            "C. E. BANTA, Clerk.
"C. D. AXTELL, President.

"Trenton Nat. Bank, Trenton, Mo., No. 2988.

" [Endorsed on back as follows :]
"W. B. Lawrence; Trenton Nat'l Bank, Trenton, Mo. Paid Feb. 10, 1902."

"Q.  Mr. Axtell, tell the jury what you and Mr. Banta did there in reference to purchasing these supplementary library books, if anything?  A.  Well, he proposed to sell those books, and we looked over them, and we thought they were a good set of books, and he wanted us to buy them, and we told him we could not buy them as there was only two of us together, and he said that would make no difference, that there was a quorum.  I then told him that I wouldn't do that.  He said he would go over and see Mr. Urton.  I was pretty busy at this time.  He was a member of the board.  He went over and saw him, and brought a written state-

ment from Urton to us. Well, after receiving this written statement from Urton, we bought the books, and gave him this warrant,'' which is heretofore marked ''Exhibit A.''

''Well, we bought the books of him, gave him a warrant for $37.50 for these books. The district never received any books, never got anything in return.''

Witness here identified warrant marked ''Exhibit A.'' It was obtained in Grundy county, Missouri, 1901.

''Q. Tell the jury on what you relied? A. We relied on Mr. Lawrence's statements. I signed it because I was president of the board; signed it for the payment of the books, and by the recommendations that he made in regard to the books. The district never received the books. No, sir; we never received them. I saw E. C. Banta sign the warrant; I delivered the warrant to him.

''Q. Upon what did you rely, Mr. Axtell, when you delivered this warrant? A. We relied upon the facts; we would get the books; we took him to be an honest man. I think this is the paper which is marked 'Exhibit B.' Mr. Banta, my daughter, and Mr. Banta's daughter was present, and probably some of the rest of the family were there; there was only two members of the board. I handed Mr. Lawrence the warrant; we had no money belonging to the incidental fund when we signed this warrant. At the time he gave us this paper he told us that he was the agent of the company. We expected Mr. Lawrence to ship the books; we had nothing to do with the book company; he said he was their agent; he said he was the authorized agent for the book company to sell and collect for them.''

Defendant here offers in evidence the following contract, marked ''Exhibit B.'' Same admitted in evidence as follows:

"Dunlap, Mo., Jan. 26, 1901.

"Received of District No. 8, Townships 61 and 62, Range 23, this 26th day of Jan. 1901, one school warrant for the sum of thirty-seven and fifty-one-hundredths dollars, payable to J. C. Tracy, manager, in payment for one set of fifty volumes of supplementary reading and reference books, to be delivered by the Missouri Supplementary Book Company on or before the 20th day of February, 1901, at the freight depot at Dunlap, Missouri.

"[In fine print:] The Company shall not be bound by any verbal contracts made by traveling salesmen or agents."                        "J. C. TRACEY,

"Manager the Missouri Supplementary Co.,

"Countersigned by W. B. Lawrence, agent.

[Signed]                        "C. E. BANTA."

Written across the face of the above receipt in ink is the word, "Sent." Written in lower lefthand corner of receipt, "No dictionary," in pencil. Written on back of receipt, "Written to about shipment May 26, 1901."

*C. E. Banta,* testified as follows, on the part of the State:

"I live in district No. 8, township 61 and 62, range 23. I am clerk of the board. I met Lawrence first at Dunlap, Missouri. Mr. Lawrence said that he was introducing a school library, and which he understood we wanted to place in our school, and he had something there he was introducing, which had been selected by State Superintendent Carrington, and also indorsed by the State Board of Education of the State of Missouri, and that they and this State Board had made arrangements with the Supplemental Book Company of the State of Missouri, or the Missouri Supplemental Book Company, or something of that nature, I believe, to introduce the libraries in the various school

districts of the State, and by having arrangements with this State Board of Education they could put these libraries down to the nominal sum of $37.50; that they would be in reach of most of the districts of the State. That is about all I remember that he said. There at that time we went into Mr. Urton's store, and he undone his list of books, and showed us the copies, you know, and then he drove down to Mr. Axtell's. He went down; well I went down also; he went down and I went down afterwards, to Mr. Axtell's; then we went to Mr. Axtell's house, and about the same conversation took place there that we had had. When the first conversation took place I think I was alone, that is at the store. He had quite a talk with me, and Mr. Urton was there part of the time, and he was busy, and said he couldn't see him at the present, for him to go down and see the other member of the board. They drove down there, and I started home; I live on beyond Mr. Axtell's, and I just stepped in, and we had the same conversation there; he made about the same assertions that he did at the store. My daughter and Mrs. Eva Banta were present when this statement was made. Well, we looked at the books that he was showing, but we told him we couldn't do anything alone; we was only just part of the board; you know that we would have to get together before we could come to any definite conclusion. So they drove over to Mr. Urton's, and I went home. In the meantime, Mr. Lawrence and Hubell were together. He came to my house with a statement, with Mr. Urton's signature to it; Mr. Lawrence stated that the other two directors were in favor of buying the books, and I told him I didn't want to sign the warrant on account of not being a witness; he said it would not make any difference, that he was in a hurry and had to leave that evening for some other place, and it would be just the same as if we had a legal meeting. When we bought the books, I relied on what

he said about its being the State Board of Education having made arrangements with him to supply these districts with these books, and in signing the warrant for $37.50, and that he alone had the power to collect the warrant. He gave us a receipt, for we both required of him a receipt showing that the warrant had been issued. That is my signature preceding the word 'clerk' there. When I signed it I relied on the truth of the statements Mr. Lawrence had made; he made such a plain and gentlemanly plea about this company being connected with the State. We never received the books.''

''Defendant objects to the foregoing testimony of C. E. Banta, for the reason that it shows that the testimony tends to show that the goods were to be delivered in the future; that it is not a crime to sell goods and not deliver them, or agree to deliver and not deliver; and for the reason that the warrant issued defendant did not bind the district, and created no legal liability; that it was void on its face, it being payable one year after date, and could deceive no one, and for the further reason that the board of directors, acting separate and apart from one another, can not bind the district. Objection overruled, to which action of the court the defendant then and there excepted at the time.''

''Mr. Lawrence gave us a receipt, which is marked 'Exhibit B.' We bought the books in good faith, and I suppose if they had come as represented, I would have been willing to receive them without any complaint because they were a good line of books that he showed us. They were a good line of books, and I don't see any reason why we would not have received them if they had have come according to contract.''

*Ed Urton,* on behalf of plaintiff, testifies as follows:

''I was one of the board of directors of School District No. 8, on January 26, 1901. The defendant came to my store on the 26th day of January, 1901, and was

selling library books. Mr. Lawrence came there and he told me that he was selling library books. He said that by reason of the Missouri Supplemental Book Company he could place these books in the school districts at a very low price, and that the books had been recommended by Professor Carrington and the State Board of Education, and that Professor Carrington had recommended that the libraries be placed in the rural districts of the State. So I told Mr. Lawrence that I was busy and did not have time to talk to him, and I says, 'Mr. Axtell and Mr. Banta, one is president and the other is clerk of the district, and you go and see them; if they think the books are worth the money, I am agreed, we'll buy them;' in fact, I rather gave him consent there to buy the books, if it was agreeable to them. So he went away, came back in an hour or such a matter, and stated that Mr. Banta or Mr. Axtell wouldn't buy the books without a written agreement from me. Se he wrote a little piece on a little piece of paper. I sent a written statement that it was agreeable to me. The district never got the books. I relied on the statement that Professor Carrington had recommended these books; I thought he ought to know.

"Q. This conversation was between you and Mr. Lawrence? A. Yes, sir.

"Q. Mr. Banta and Axtell were not present? A. No, sir.

"Q. You never was present, personally, with them nor had any notice of a meeting of the school board at that time, did you? A. No, sir, there was no meeting, as far as I know."

*Mrs. Dot Axtell*, testified on part of the plaintiff, as follows:

"He said that he was representing the Missouri Supplementary Book Company, that he was working to sell these books to the various school districts, and that they had been recommended by W. T. Carrington, the State Superintendent of Public Schools of Missouri,

and that he was working for the State Board of Education, and that the books had been approved by them or Mr. Carrington; thought they were needed in every school district, and should be purchased."

*Miss Eva Banta,* testified as follows:

"I was at my father's house about January 26, 1901, when the defendant came there. He said he was the authorized agent of the Supplemental Book Company to sell those books which had been approved by W. T. Carrington, State Superintendent. He said he was selling these books for the Supplementary Book Company, and was their agent. He named some of the books, some of them were Plutarch's Lives, Life of Washington, Poems of Bryant, and some histories."

*Geo. D. Hubell* testified.

"I introduced Mr. Lawrence to Mr. Urton. Said I am here in the interest of the State Board of Education and the Missouri Supplementary School Book Supply Company, Reading and Reference School Book Company. He said, that is as best as I can remember, that it had always been the desire of W. T. Carrington and the State Board of Education to furnish the several school districts of the State with proper reference reading books; he said Mr. Carrington and the State Board of Education had got together and had the proper books; that Mr. Carrington had selected this fifty volumes of books as the necessary books; that Mr. Carrington had selected this number of books because he thought the number of books and the price at which they were now quoted, would be in the reach of the several districts of the State. He said he was the authorized agent of the Missouri Supplemental Book Company, and the State Board of Education, of which W. T. Carrington was a member, to place these books and sell them in the several counties of the State. Mr. Urton said he was only one of the directors, and the books suited him, and to go and see the other directors. Mr. Lawrence and myself got in the buggy and went down

to the home of Mr. Axtell; went and saw Mr. Axtell where the rest of the family was. Mr. Lawrence made the represntations he did to Mr. Urton. At that time, before Mr. Lawrence started in with these representations, Mr. Charles Banta, another one of the directors, came in, and the price suited them, and the books suited them, and they were in favor of buying them. Mr. Banta and Mr. Axtell said they were not together as a board; they could not buy them, and besides, they did not want to transact any business unless Mr. Urton was present, and Mr. Lawrence said, 'I'll go up and get Mr. Urton's written contract;' I believe he said written contract. He says, 'It is my last day here in this county, and I've got to go, and I can't wait for the board to meet,' and so we went back to Dunlap, a mile north, and Mr. Lawrence wrote out a written statement; Mr. Urton signed it, then we went back to the house of Cleverance Axtell, and showed him the statement of Mr. Urton, and we went to the house of Charles Banta, and he said it was all right. Mr. Lawrence wrote out an order payable to himself; he wrote out same on piece of paper, and Mr. Banta signed it.''

*Mr. Axtell,* the president of the board, further testified as follows:

''Q. Upon what did you rely, Mr. Axtell, in delivering this warrant to the defendant? A. *I relied upon his good faith that we would get the books.* Well, it was for payment of the books. We relied upon the fact that we thought we would get the books. We took him to be an honest man, and that we would get them.''

*Mr. Banta,* another member of the board of directors, testified as follows:

''Q. Now if these books had come according to this contract here, you would have received them all right, would you, Mr. Banta? A. Why, if they had come in good shape, why I suppose that is all we could have done.

"Q. Now, the books that he proposed to sell you, if they had been shipped to you, you would have accepted them? A. Why I suppose so.

"Q. And the reason why this prosecution has been instituted is because he did not ship you the books? A. Why, we bought the books in good faith, and I suppose if they had come as represented, we would have been willing to receive them without any complaint, because they was a good line of books that he showed us.

"Q. If the Missouri Supplementary Book Company had shipped these books that you purchased, why you would have made no objections or complaint about it? A. Yes, sir. They was a good line of books, and I don't see any reason why we would not have taken them if they had come according to agreement.

"Q. And there would have been no complaint whatever—nothing said about it? A. Well, I could not say whether they would not have been.

"Q. So far as you know? A. Yes, so far as I know."

Mr. Urton, also gave further testimony as follows:

"Q. Now, if the books had been shipped that you purchased, why that would have been the end of it, so far as you are concerned, wouldn't it, Mr. Urton? A. Yes, sir.

"Q. Now, Mr. Lawrence told you Mr. Urton—that is your name I believe—Urton? A. Yes, sir.

"Q. That the Missouri Supplementary Book Company would ship the books, that he was their agent. That is what he told you? A. I don't remember that he told me that he would ship the books. I don't remember who he said would ship the books,

"Q. He said that he was the agent for that company? A. He said that by reason of the contract with this company that he was able to place the books with the rural districts of this State.

"Q. By reason of a contract with the Missouri Supplementary Book Company? A. Yes, sir."

*Mr. Axtell,* president of the board, further testified as follows:

"Q. Well, go ahead and tell what this defendant told you there about these books, if there was anything more, Mr. Axtell? A. Well, he said that these books was put out by the Missouri Supplementary Book Company and Mr. Carrington approved of these books, and urged that each and every school district should buy these books.

"Q. Now, by this paper which was executed you knew that Lawrence was not to ship the books? A. Well, he represented himself to be the agent.

"Q. Yes, and you relied upon this book company here? A. We relied on Mr. Lawrence.

"Q. Didn't rely on this paper? A. Well, at the time he give us this paper he told us he was the duly authorized agent.

"Q. You expected this book company would ship the books? A. We expected that Mr. Lawrence would ship them.

"Q. Well, this does not state that he agreed to ship them, does it? A. He said that he was their agent.

"Q. You looked to the book company to ship the books didn't you? A. I looked to Mr. Lawrence to ship them books.

"Q. And didn't look to the book company? A. We didn't have anything to do with the book company. He said he was their agent.

"Q. Agent of the book company? A. Yes, sir.

"Q. Now as the agent—he purported to be the agent of this company, didn't he? A. Yes, sir.

"Q. Now you didn't understand that Lawrence had any books? A. We understood that he was the agent.

"Q. For this book company? Isn't that the fact, Mr. Axtell? A. I say that he said that he was their

agent, their authorized agent for them to sell and collect for them.

"Q. Authorized agent to sell and collect for them. A. Yes, sir."

*Mr. Urton,* another of the school directors, testified as follows:

"Q. Well, just the best of your impression, knowledge and belief? A. He said by reason of a contract with the Missouri Supplementary Book Company he had, he could place these books in the rural districts at a very low price, etc.

"Q. He told you—etc.—that the Missouri Supplementary Book Company would ship the books? That he was their agent? That is what he told you? A. Now, I don't remember that he told me that they would ship the books. I don't remember that he said he would ship the books.

"Q. He said that he was agent for that company? A. He said that by reason of a contract with that company, he was able to place the books in the rural districts of the State.

"Q. By reason of a contract with the Missouri Supplementary Book Company? A. Yes, sir.

"Q. Then you knew that the Missouri Supplementary Book Company was the company that was to ship the books? A. Why, I presume so."

At the close of the evidence the court instructed the jury upon all four counts; the instructions applicable to the first count, upon which the defendant was convicted, were as follows:

"'The first count charges the defendant with attempting by false, fraudulent representations, statements and pretenses to obtain a school warrant for thirty-seven dollars and fifty cents from C. D. Axtell, C. E. Banta and Ed. Urton, constituting the board of directors of School District Number 8, Townships 61 and 62, Range 23, in Marion township, Grundy county, Mis-

souri, by false representations to the said board of directors.

"8.   You are instructed that in this cause there are for your consideration four counts of the information, which was filed on the 10th day of November, 1902. The defendant has pleaded not guilty to the allegations of the information and it becomes your duty to determine as to his guilt or innocence under the first four counts of the information.   While the information contains four counts you are instructed that if you find the defendant guilty, you should indicate upon which count you find him guilty.   And in this connection, and in connection with the other instructions given you, you are instructed that the defendant in each count of the information is charged with having made the following false and fraudulent representations, statements and pretenses, with the felonious intent to cheat and defraud, to-wit:

"That the said W. B. Lawrence was then and there the duly authorized agent of the educational department of the State of Missouri to introduce, sell and deliver and receive payment therefor, a certain set of books, known and designated as 'Supplementary Reading and Reference Books,' and fifty volumes in number, to the various school districts of the State of Missouri; that he was so sent out by the educational department of the State of Missouri for the purpose of introducing and placing a set of said books in each of the school districts of the State of Missouri.   That the said fifty volumes of books, which he, the said W. B. Lawrence, was selling, introducing aforesaid, had been selected by W. T. Carrington, State Superintendent of Public Schools for the State of Missouri, and approved by the State Board of Education of the State of Missouri.   That the said W. T. Carrington, State Superintendent of Public Schools for the State of Missouri, had requested and urged the school districts all over the State of Missouri to buy the books.   That the State Board of Education had made a contract with the Missouri Supplementary

Book Company to furnish to the various school districts of the State of Missouri, said fifty volumes of books at a very low price for the purpose of introducing them in said school districts. That the sum of thirty-seven and fifty one-hundredths dollars was the said introductory price which had been so agreed upon as aforesaid. That W. T. Carrington, State Superintendent of Public Schools for Missouri, had made a contract with him, the said W. B. Lawrence, to introduce these books into the various school districts of the State of Missouri, and to sell said books to said school districts, and to receive and collect the purchase price therefor. That the laws of the State of Missouri compel each and every school board in the State of Missouri to purchase books.

"9. You are instructed that if you believe and find from the evidence in this case, beyond a reasonable doubt, that at any time within three years next before the 10th day of November, 1902, the date of the filing of the information in this case, the defendant, W. B. Lawrence, at the county of Grundy, in the State of Missouri, intended to cheat and defraud by means of false and fraudulent representations, statements and pretenses, feloniously and designedly attempted to obtain a school warrant for thirty dollars or more of the property of said district hereinafter named of C. D. Axtell, C. E. Banta and Ed Urton, and that they constituted the board of school directors of the School District Number 8, Townships 61 and 62, Range 23, in Marion township, Grundy county, Missouri, then you will find the defendant guilty, as charged in the first count of the information, and assess his punishment at imprisonment in the State penitentiary for a term of not less than two years and not more than seven.

"10. You are instructed that if you believe and find from the evidence that the defendant by the means set out in the information in this case, attempted to get and procure witnesses Axtell, Banta and Urton, School directors of School District Number 8, Townships 61

and 62, Range 23, Grundy county, Missouri, if you find they were directors of said school district, to issue to him, defendant, a legal warrant of said school district, in the sum of $37.50, and in such an attempt to do so, if you will find he made such attempt, the defendant did all things in his power looking to the accomplishment of his purpose to secure said warrant and made the representations, statements and pretenses, alleged in the information, with the felonious intent to cheat and defraud, and that the only thing that prevented the warrant from being a legal obligation, was the failure or lack of authority upon the part of the said Axtell, Banta and Urton to issue a legal warrant, over which defendant had no control, then you should find the defendant guilty, as charged in the first count of the information.''

Upon this cause being submitted to the jury, they returned a verdict of guilty upon the first count in the information, and assessed defendant's punishment at two years in the penitentiary. After unsuccessful motions for new trial and in arrest of judgment, he prosecutes his appeal to this court.

It will be observed that the defendant in this cause was convicted upon the first count of the information, which charged him with an attempt to procure a school warrant or order, by false representations to the directors of the school district, with intent to cheat and defraud.

The acts with which defendant is charged, as constituting a criminal offense, relate to a sale of certain books to a school district. Hence, it is well, at the very inception of this investigation, to ascertain the relationship of the directors to the district, and their powers in respect to the transaction of the business concerning the same.

The lawmaking power of this State has made every school district organized in pursuance of the provisions respecting their organization, a body corporate. Thus it was provided in section 9739, Revised Statutes 1899:

"All subdistricts, as organized and bounded, shall hereafter be known as school districts and thus denominated and numbered by the county court for the general purposes of education; and every such district, as well as those hereafter organized under the provisions of this chapter, shall be a body corporate, and possess the usual powers of a corporation for public purposes, under the name and style of 'District No. ——, township ——, Range —— of —— county;' and in that name shall be capable of suing and being sued."

Directors of these corporations are selected in pursuance of the provisions of law, which designate the number, the time and manner of their selection. The directors are chosen to transact the business of the school district. In other words, they are the officers of the corporation with authority to exercise the powers usually exercised by corporations.

Section 9761, Revised Statutes 1899, provides as follows for the organization of the board and the transaction of business:

"The directors shall meet within four days after the annual meeting, at some place within the district, and organize by electing one of their number president; and the board shall, on or before the fifteenth day of July, select a clerk, who shall enter upon his duties on the fifteenth day of July, but no compensation shall be allowed such clerk until all reports required by law and by the board have been duly made and filed. A majority of the board shall constitute a quorum for the transaction of business: *Provided,* each member shall have due notice of the time, place and purpose of such meeting; and in case of the absence of the clerk, one of the directors may act temporarily in his place. The clerk shall keep a correct record of the proceedings of all meetings of the board."

It will thus be seen that the officials of the school district—a body corporate—must conduct the business of the district in an official way, as indicated by the statute.

To have issued a school warrant, binding upon the district mentioned in this cause, for the purchase of the books sought to be purchased by it, the directors in such transaction would be required to meet as a board, with one of their number as clerk, who is required to keep a correct record of the business of such meeting; then, as a body, make the purchase, order the warrant drawn in conformity to the requirements of the statutes, all of which must be evidenced by the record of the meeting.

The Kansas City Court of Appeals in Kane & Co. v. School District of Calhoun, 48 Mo. App. l. c. 414, in treating of the legal methods of conducting the business of these school corporations, said:

"We are of the opinion that the only proper evidence of the acts of the corporation was the record required to be, and which was kept by the board. It seems that the secretary did keep a record of such proceedings, as the statute imperatively demanded; but nowhere was there found any authority from the board for the contract here alleged and relied on. The rule seems to be that if the statute creating the corporation and providing for its proceedings shall require such proceedings to be preserved in a record kept for that purpose, then such record is the only proper evidence of such proceedings."

This court, in Johnson v. School District, 67 Mo. 319, in speaking on this subject, under the statute substantially the same as the present one, said:

"It is clear that the members of the board in transacting the business for the district were to do so in meetings of the board. In purchasing maps and globes, they could only act when assembled together in a meeting of the board of directors, and neither two nor all of the directors acting separately and apart from each other, could bind the district by any contract they might make. The directors were not authorized to draw orders on the township clerk or treasurer to pay for globes or maps, or any other expenses incurred for

the district. The law expressly provides that the clerk of the subdistrict shall sign such orders, and that they shall be drawn on the township clerk, and unless so drawn and signed the township clerk could not pay them."

In that same case, what was announced by the Supreme Court of Iowa, upon this subject, in Taylor v. District, 25 Iowa 450, was approvingly quoted. It was said by that court:

"The township district is a body corporate; certain powers are reserved by or conferred upon the electors; others are given by law to the district board, and others again to subdirectors. The electors composing the corporate body act by and through specific agencies and in the mode prescribed by law. They can not, as individuals, when not convened at the times and places contemplated by law, vote to raise a tax, authorize the making of a contract, delegate their powers, nor exercise any of the powers conferred upon them as electors by law. The law contemplates action by them in their aggregate capacity, when duly and properly assembled, and not the action of each elector by himself, on the streets, at his store or shop, in the church or schoolhouse."

From the testimony disclosed by the record in this case, it is not pretended that the directors of the district alleged in the information, upon which this prosecution is based, acted as a board or as a body, or that there was any pretense of keeping a record of their proceedings.

To maintain this conviction, it must be conceded that the warrant or order secured was not a legal obligation against the district, for this conviction is for an attempt to procure a legal school warrant, and if the warrant secured was a legal one, then there could be no such thing as an attempt to secure it.

Our attention is first attracted to the views of the trial court upon the law as applicable to the count in the

information upon which defendant was convicted. As before stated, the conviction in this case was for an attempt to commit an offense. The concluding part of instruction numbered 10 tells the jury that ''if you will find he made such attempt, the defendant did all things in his power looking to the accomplishment of his purpose to secure said warrant and made the representations, statements and pretenses, alleged in the information, with the felonious intent to cheat and defraud and that the only thing that prevented the warrant from being a legal obligation, was the failure or lack of authority upon the part of said Axtell, Banta and Urton to issue a legal warrant, over which defendant had no control, then you should find the defendant guilty, as charged in the first count of the information.''

If that instruction is to be interpreted according to the terms used, then it is clearly erroneous. It says, substantially, if the defendant made the representations with intent to cheat and defraud, and the ''only thing which prevented the warrant from being a legal obligation was the failure or lack of authority of the directors to issue a legal warrant over which the defendant had no control, you will find him guilty.'' If the directors had no authority to issue a legal warrant, then there could not possibly be any offense for obtaining one from them; hence, there could be no attempt to obtain a legal warrant, when no power or authority existed to issue it. It may be that the learned trial judge applied these terms to the time and circumstances when the illegal warrant was issued. If so, he was correct in the use of the terms as applicable to that transaction. Still, this would leave the jury groping in the dark as to the proper course to be pursued by the directors in order to issue a legal school warrant, and in no way directs them in the application of the alleged false statements, to the directors, at a time and under circumstances that they were authorized to issue a legal warrant. This instruction did not properly declare the law,

even though it was based upon a valid information, and evidence sufficient to warrant a conviction.

The record further discloses that the defendant challenged by demurrer, duly filed, the correctness of the count in the information upon which the defendant was convicted.

The reasons assigned in the demurrer are: first, that it charged no offense against the defendant; second, that it attempted to charge several independent and contradictory charges in the same information.

The allegations in the first count of the information as to the false and fraudulent representations are as follows:

"1.   That the said W. B. Lawrence was then and there the duly authorized agent of the educational department of the State of Missouri to introduce, sell, deliver and receive payment therefor, a certain set of books known and designated as Supplementary Reading and Reference Books, and being fifty volumes in number, to the various school districts of the State of Missouri, and that he was sent out by the educational department of the State of Missouri for the purpose of introducing and placing a set of said books in each of the school districts of the State of Missouri.

"2.   That the fifty volumes of books that he was selling and introducing as aforesaid, had been selected by W. T. Carrington, State Superintendent of Public Schools for the State of Missouri, and approved by the State Board of Education for the State of Missouri.

"3.   That the said W. T. Carrington, State Superintendent of Public Schools for the State of Missouri, had recommended and urged the school districts all over the State of Missouri to buy said books.

"4.   That the State Board of Education had made a contract with the Missouri Supplementary Book Company to furnish the various school districts of the State of Missouri said fifty volumes of books at very low prices for the purpose of introducing them in said

school districts. That the sum of $37.50 was said intro-
ductory price, which had been agreed upon as afore-
said.

"5. That W. T. Carrington, State Superintendent
of Public Schools for the State of Missouri, had made
a contract with him, the said W. B. Lawrence, to intro-
duce these books in the various school districts of the
State of Missouri, and to sell said books to said school
districts and to receive and collect the purchase price
therefor.

"6. That the laws of the State of Missouri com-
pelled each and every school board in the State of Mis-
souri to purchase said books."

No one can, read the allegations as herein quoted,
all contained in one count, and escape the conclusion
that they are repugnant and inconsistent with each
other. First, it is alleged that defendant was the agent
of the State Board of Education; secondly, that the
State Board of Education approved the books; third,
that the State Board of Education had made a contract
with the book company to supply the books; fourth, that
W. T. Carrington, State Superintendent of Public
Schools, had made a contract with defendant to intro-
duce these books in the various school districts, and to
sell said books to the districts and to receive and col-
lect the purchase price therefor.

It is difficult to understand how defendant could
have a contract with the State Board of Education, con-
sisting of a body of men, to sell, deliver and receive pay
for the books, and also a contract with the Superinten-
dent of Public Schools to do the same thing. It is glar-
ingly inconsistent to say that he was the agent of the
State Board of Education, and at the same time, the
agent of W. T. Carrington, in the performance of the
same service. To emphasize this inconsistency and ab-
surdity of the alleged false statements, it is averred
that "the laws of the State of Missouri compelled each
and every school board in the State to purchase these

books.'' If that was true, then the board was compelled to buy the books and it was only a question as to whom they would buy them of, and the defendant gave the directors an opprotunity of determining their choice, whether they would buy from him, as agent of the State Board of Education, for whom, it is alleged, he represented he was authorized to sell the books, or from him under the contract he had with Mr. Carrington, to sell the books, or from him, as agent of the Missouri Supplementary Book Company.

The law prohibited the State Superintendent of Public Schools from making the contract with defendant that it is alleged he represented was made. [Sec. 8959, R. S. 1899.] The directors were presumed to know this was the law.

If the representations were made by the defendant, as charged in the first count of the information, the fact of making such representations furnishes the reason why they were not calculated to deceive a reasonably prudent man. Not only are they inconsistent, but extremely absurd. If the directors did not want to purchase the books, we are unwilling to reflect upon their intelligence by concluding that the representations, as recited, induced them to make the purchase.

The demurrer to the first count in this information should have been sustained, for the reason that the allegations, as to false representations, were repugnant and inconsistent, and if made as stated, were not calculated to deceive and thereby accomplish the purpose sought.

The instructions given in this cause were erroneous. Instruction numbered 8 recites all the representations heretofore referred to, and that is followed by instructions numbered 9 and 10, which told the jury that if they believed from the evidence that the defendant made the representations, as recited and set out in the information, they will find the defendant guilty as charged in the first count of the information. These declarations

were absolutely in conflict with instructions numbered 4 and 5, given on the part of the defendant, which told the jury:

"4. The court instructs you that the defendant had the lawful right to sell and solicit for sale all books named and recommended in the pamphlet read in evidence, published by or under the authority of W. T. Carrington, Superintendent of Schools in the State of Missouri and president of the Missouri State Board of Education, and that he had the legal right to state and represent that said books had been so recommended and indorsed by the State Superintendent of Public Schools, and by the educational department of the State of Missouri, and to do so was no crime under the law, and for the doing of which alone you can not convict him in this case.

"5. The court instructs you that no representations or statements made by the defendant with reference to what the law was or is, or what were the legal duties of the school board or school district or board of directors thereof, if you find he made any, will constitute any offense, and you can not convict him in this case for making them or for obtaining or receiving anything or attempting to do so, solely on account thereof."

The very representations that the court declares in those instructions could not constitute the basis of a criminal offense, were made a part of the foundation in instructions numbered 7, 8, 9 and 10, upon which the jury were authorized to convict the defendant as charged in the first count of the information. The burden should not have been cast upon the jury to determine which declarations were to be followed.

Numerous other errors are apparent in the instructions, as applicable to other counts in the information. We will not discuss them, as they have no application to the count upon which the defendant was convicted. We have read, with great care, the entire evidence in

this case, as disclosed by the record, and we dare say that no one can read it and escape the conclusion that the conviction in this cause resulted, not from the offense charged, but from a failure of the district to get the books purchased from the defendant. It may be that defendant ought to be sent to the penitentiary. We by no means commend his conduct to the public, but before this can be done, if we are longer to respect the well-settled principle of law, there should be a clear legal charge supported by competent as well as sufficient evidence to authorize his conviction. This defendant was convicted for an attempt to procure, from certain school directors, a school warrant, by false and fraudulent representations. The evidence in this cause is clearly insufficient to support the verdict. It will not justify this verdict to say that the district did not get the books. The defendant is not on trial for failure to comply with his contract and deliver the books purchased from him. It is equally unsatisfactory to say that the school directors relied upon his representations. The unquestioned, written testimony, the contract or receipt given by the defendant, shows beyond question, that they were negotiating for books, from this defendant, not as the agent of the Board of Education or Mr. Carrington, but as the agent of the Supplementary Book Company.

The directors, or some of them, testify that they were satisfied with the line of books, and had they been delivered no complaint would have been made. They further say, "We were relying upon the fact that the books would be delivered."

There is an entire absence of any testimony that they did not want the books, or that if the representations had not been made, they would not have purchased them. The old common expression that "there are two bad paymasters, one who never pays and one who pays in advance," is very appropriate to this case. That was the whole trouble in this transaction, the effort to pay for these books in advance. Can any intelligent man

believe. that these school directors bought the books simply because defendant represented that he was the agent of the Board of Education or Mr. Carrington, regardless of the fact whether the district wanted or needed the books? In supplying the wants and needs. of a district, its taxable wealth must pay for it, and is it not indulging a very violent presumption of official misconduct, that the directors of a corporation would incur a debt, simply to gratify the wishes of any one, in the introduction of an article, which, applying the theory of this case, was not desired or needed, in the proper conduct of the business of the corporation.

The testimony simply shows that the directors of this school district permitted the defendant to persuade them to make a contract for certain books. The fact that he stated that the Board of Education or Mr. Carrington approved the books or that he was representing them in selling them, furnished no reason why they had to buy them. Aside from that, the contract for the delivery of the books indicates in unmistakable terms that he was not representing the Board of Education or Mr. Carrington, but was acting for a book company. It may be urged that, the conviction being simply for an attempt to commit an offense, only such testimony as applies to that offense will be considered. We will say as to that proposition, if we are to consider only the representations as made, the defendant having been convicted of only an attempt to commit an offense, being a concession that the directors did not act upon the statements of the defendant, it but adds additional force to the views of this court, that the statements were not calculated to deceive, for the reason that the directors were not deceived by them. On the other hand, in passing upon the question of an attempt to commit an offense, if we are to consider the testimony upon the entire transaction, not only that which is applicable to the attempt, but as well that applicable to the completed acts of

both the defendant and the directors, then it includes the issuing of what is termed the illegal or void warrant, and the contract of purchase, which resulted in the issuance of such warrant.   Considering the entire transaction, the contract or receipt showing the purchase of the books, the issuing of the warrant and the testimony of the directors, it will certainly not be contended that the directors issued the warrant upon the representations alleged.   They all say that they looked to him to ship the books; that the warrant was issued in payment for the books promised.   This is denominated an attempt to commit an offense.   Is it not clearly apparent from all the testimony in this cause, that if the defendant had not obtained the money on this warrant from the bank, and the district had not paid the bank for the warrant, this case would never have been heard of?

This conviction can not be sanctioned because the defendant obtained the money for books which he promised to deliver, or for failure to deliver them.   That is not the charge upon which this prosecution is based.

There is an absence of any testimony indicating that the defendant attempted to get the directors to meet officially, and order the warrant drawn; but the reverse appears.   He did just what he attempted to do.   He discussed the sale of the books with the directors individually, filled out the warrant himself, executed the receipt or contracted for it, obtained the money from the bank on the warrant as drawn.   He accomplished, doubtless, what he intended; that was to obtain the money for the promise of the delivery of the books.   To constitute an attempt to commit an offense, the person making the attempt must have in mind the offense itself.   The defendant, in this cause, filled out the warrant; the presumption is that he intended the result of his act, and it seems in this case that the illegal warrant answered the same purpose as one in due form.

It is apparent that this transaction was just simply an ill-considered matter.   The directors expected to

get the books in consideration for the warrant, and we are unwilling to reflect upon the intelligence of the directors by concluding that they did not want the books, or did not need them, and simply made the purchase at the expense of the taxpayers of the district, to gratify the State Board of Education and the State Superintendent of Public Schools. The expression of this court in State v. Cameron, 117 Mo. l. c. 648, may be very appropriately applied to the facts of this case. GANTT, J., speaking for the court, said:

"It is not the policy of the law to punish as a crime the making of every foolish or ill-considered agreement. If it is, the jails and prisons must be greatly enlarged. 'Where the pretense is absurd, or irrational, or such as the party injured had, *at the very time,* the means of detecting *at hand,* it is not within the act.'"

To the same effect is the case of State v. Barbee, 136 Mo. l. c. 445. It was said in that case by SHERWOOD, J.:

"It is well settled law, both in this State and elsewhere, that it is not *every false pretense* which can be made the basis of a criminal prosecution. It must be such an one as is calculated to deceive."

We have given every phase of this case our most careful attention, and while the conduct of the defendant does not meet with our approval, still we are unable to reach any other conclusion than that this judgment is unsupported by the facts surrounding this transaction.

The judgment will be reversed, and the defendant discharged. All concur.