**UNITED STATES of America**

v.

**Philip BERRIGAN, Appellant in No. 72-1938, and Elizabeth McAlister.**

**Appeal of Elizabeth McALISTER, in No. 72-1939.**

**Nos. 72-1938, 72-1939.**

United States Court of Appeals, Third Circuit.

Argued April 26, 1973.

Decided June 27, 1973.

Ramsey Clark, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D. C. and Paul O'Dwyer, O'Dwyer & Berstien, New York City, for appellants.

A. William Olson, Asst. Atty. Gen., S. John Cottone, U. S. Atty., Robert L. Keuch, Chief, Appeals and Research Section, Garvin Lee Oliver, Dept. of Justice, Washington, D. C., for appellee.

Before VAN DUSEN, ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Father Philip Berrigan and Sister Elizabeth McAlister appeal from judgments of conviction on seven counts of violating 18 U.S.C. § 1791,[1] as augmented by 28 C.F.R. § 6.1,[2] for sending seven letters into and out of Lewisburg Federal Penitentiary "without the knowledge and consent of the warden." (Counts IV–X.) [3]

Appellants were originally indicted, along with six others, for conspiracy to kidnap Presidential Advisor Henry Kissinger, to destroy the underground heating system in Washington, D. C., and to unlawfully interfere with the Selective Service System by engaging in "draft board raids" (Count I); for unlawfully sending through the mails a letter containing a threat to kidnap Mr. Kissinger (18 U.S.C. § 876) (Counts II and III); and for smuggling or attempting to smuggle letters into and out of a federal prison without the knowledge and consent of the warden (Counts IV to X).

The jury was unable to agree upon a verdict on Counts I, II and III. Appellants urge that we reverse the convictions on Counts IV to X, or, alternatively, grant a new trial. Appellants have advanced numerous contentions which we will consider seriatim.

## I.

■ Appellants contend that they are the victims of a prosecution which is discriminatory as to them, and, therefore, offensive to the equal protection clause. As to the counts for which they were convicted, they argue that (1) there have been relatively few prosecutions under § 1791, (2) these isolated prosecutions concerned letters directly relating to prison conditions, and (3) none of these cases involved prosecution of a letter writer who was not a prisoner, i. e., the position of Sister McAlister. They also argue that the prosecution of all the counts was conducted for political reasons, because of defendants' efforts to end the use of United States military forces in Southeast Asia and for personal reasons to vindicate the reputation of the late Director of the Federal Bureau of Investigation. Therefore, appellants conclude that the charges against them violate the concept of equal justice required by Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed.2d 220 (1886), and reaffirmed in Two Guys v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961). See also United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972); and United States v. Robin-

1. 18 U.S.C. § 1791 provides:
 Whoever, contrary to any rule or regulation promulgated by the Attorney General, introduces or attempts to introduce into or upon the grounds of any Federal penal or correctional institution or takes or attempts to take or send therefrom anything whatsoever, shall be imprisoned not more than ten years.

2. 28 C.F.R. § 6.1 provides:
 The introduction or attempt to introduce into or upon the grounds of any federal penal or correctional institution or the taking or attempt to take or send therefrom anything whatsoever without the knowledge and consent of the warden or superintendent of such federal penal or correctional institution is prohibited.

3. Father Berrigan was sentenced to four concurrent terms of two years' imprisonment on Counts IV, VI, VIII and X, all to run concurrently with sentences he was then serving. He is now on parole. Sister McAlister was sentenced to one year on Count V. Sentence was suspended on Counts VII and IX, subject to a three-year probationary period to begin upon release from custody.

son, 311 F.Supp. 1063 (W.D.Mo.1969). These cases teach that although the government is permitted "the conscious exercise of some selectivity" in the enforcement of its criminal laws, Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), any "systematic discrimination" in enforcement, *Robinson, supra,* 311 F.Supp. at 1065, or "unjust and illegal discrimination between persons in similar circumstances," *Yick Wo, supra,* 118 U.S. at 374, 6 S.Ct. at 1073, violates the equal protection clause and renders the prosecution invalid.

Distillation of appellants' discriminatory prosecution arguments yields three separate contentions: (1) that the question of the existence of discriminatory prosecution was a matter for the jury; (2) that appellants produced unmistakable evidence of discriminatory prosecution; and (3) that appellants' attempts to prove discriminatory prosecution were improperly frustrated by the district court.

■ Observing preliminarily that this court has already held that the burden of proving intentional or purposeful discrimination is placed upon the defendants, United States v. Malinowski, 472 F.2d 850, 860 (3d Cir. 1973), we proceed with our analysis of appellants' contentions.

### A.

Appellants sought to introduce evidence of discriminatory prosecution to the jury. After hearing argument on this point, the court decided that "discriminatory prosecution is not a defense to be presented before a jury but is a matter that could have been raised at pretrial on a motion and perhaps can be raised post-trial on a motion, if necessary." Appellants assert that the court erred in so ruling, and rely upon decisions of intermediate state courts in California and New York, People v. Harris, 182 Cal.App.2d Supp. 837, 5 Cal.Rptr. 852 (App.Dept.Sup.Ct.1960); People v. Utica Daw's Drug Co., 16 A.D.2d 12, 225 N.Y.S.2d 128 (1962), for the proposition that the defense of discriminatory prose-

cution should be presented to the jury. Moreover, they urge that the Supreme Court in Duncan v. Louisiana, 391 U.S. 145, 194, 88 S.Ct. 1444, 20 L.Ed.2d 49 (1968), contemplated this result when the Court observed that the right to a jury trial is granted to prevent oppression by the government, and to protect against arbitrary law enforcement. "Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge." 391 U.S. at 156, 88 S.Ct. at 1451.

■ On more than one occasion this court has remarked that the citation of isolated nomenclature from miscellaneous opinions does not rise to the level of black letter law. United States v. Malinowski, *supra,* 472 F.2d at 854; United States v. Vallejo, 482 F.2d 616 (3 Cir., 1973), (concurring opinion). Hence, the stark fact remains that *Duncan, supra,* never addressed the issue before us, and the intermediate state court cases are not controlling here. Moreover, appellants' characterization of these state decisions is totally inaccurate. Although in People v. Utica Daw's Drug Co., the Appellate Division of the New York Supreme Court did reverse appellant's conviction because the trial court improperly excluded evidence of discriminatory prosecution, the Supreme Court *expressly disapproved* the trial court's submission of the discriminatory prosecution issue to the jury. The court recognized the existence of "well nigh insoluble problems if a claim of discriminatory enforcement is left to the jury," and remanded the case with instructions that:

The claim of discriminatory enforcement should not be treated as a defense to the criminal charge, to be tried before the jury and submitted to it for decision, but should be treated as an application to the court for a dismissal or quashing of the prosecution upon constitutional grounds. Insofar as a question of fact may be in-

volved, the court should take the evidence in the absence of the jury and should decide the question itself.

225 N.Y.S.2d at 131–132.

In fact, two years after the New York Supreme Court's decision in *Utica Daw's Drug Co.*, the New York Court of Appeals cited that case for the principle:

> A denial of equal protection is not a defense to the criminal prosecution in the ordinary sense in which, when the point is raised, the prosecution has to prove beyond a reasonable doubt that it is not discriminatory. It is in the nature of an injunctive proceeding to bar prosecution of a crime regardless of guilt—*which the defendant must establish to the court, not the jury*, "by a clear preponderance of the proof." (People v. Utica Daw's Drug Co., 16 A.D.2d 12, 18, 225 N.Y.S. 128, 134, supra).

People v. Walker, 14 N.Y.2d 901, 252 N. Y.S.2d 96, 99, 200 N.E.2d 779, 781 (1964). (Emphasis supplied.) [4]

People v. Harris, *supra,* is similarly inapposite since the case never treats the issue of whether the defense of discriminatory prosecution should be submitted to the jury.

▉▉▉ Indeed, appellants' argument misconceives the proper division of responsibility between judge and jury in a federal criminal proceeding. By both tradition and constitutional mandate the jury is given the responsibility of determining guilt or innocence according to instructions of law delivered by the court. The question of discriminatory prosecution relates not to the guilt or innocence of appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution. Rule 12(b)(2), F.R.Cr.P., provides: "Defenses and objections based on defects in the institution of the prosecution . . . may be raised only by motion before trial." Rule 12(b)(4) provides: "An issue of fact shall be tried by a jury if a jury trial is required under the Constitution or an act of Congress. All other issues of fact shall be determined by the court with or without a jury or on affidavits or in such other manner as the court may direct."

The Supreme Court has distinguished between the necessity for a jury determination when the question is the defendant's guilt or innocence, and those preliminary matters concerning the right of the court to conduct the trial. Thus, in reviewing a prosecution for smuggling alcoholic spirits into the United States in violation of federal prohibition laws, Chief Justice Taft observed that "[t]he issue whether the ship was seized within the prescribed limit did not affect the question of the defendants' guilt or innocence," and, therefore, was not properly a jury question. Ford v. United States, 273 U.S. 593, 606, 47 S.Ct. 531, 535, 71 L.Ed. 793 (1927).[5]

---

4. *See also* United States v. Robinson, *supra,* 311 F.Supp. at 1064, where the court rejected defendant's argument that he be permitted to present the defense of discriminatory prosecution to the jury, and the court itself decided this issue.

5. *See also* United States v. H. E. Koontz Creamery, Inc., 232 F.Supp. 312 (D.Md. 1964), where the court held that a motion to dismiss an indictment on the ground of double jeopardy did not warrant a fact finding by a jury. In what Professor Wright has described as a "learned opinion," Wright, Federal Practice and Procedure, § 194, at 414 (1969), the court said:

> The motion here presented is preliminary to a trial; it does not affect the moving parties' guilt or innocence; it affects only the trial court's right to hold them for trial. That such a determination (although not in a double jeopardy case) does not require a jury trial is shown by cases such as Ford v. United States, 1927, 273 U.S. 593, 605–606, 47 S.Ct. 531, 71 L.Ed. 793; Dennis v. United States, 1951, 341 U.S. 494, 512–513, 71 S.Ct. 857, 95 L.Ed. 1137; reh. den. 1952, 342 U.S. 842, 72 S.Ct. 20, 96 L.Ed. 636.

> 232 F.Supp. at 317.

Moreover, the federal substantive law of crimes derives only from statute, whereas federal practice emanates from rules and statutes. In the federal experience there has never been any constitutional requirement that the jury find facts other than those relating to the issue of guilt or innocence. *See, e.g.,* Ford v. United States, *supra.* Appellants have not cited, nor has our research discovered, any federal statute or rule in support of their present contention.[6]

### B.

After consideration of the evidence of discriminatory prosecution adduced at trial and at a special, post-trial evidentiary hearing, the court found that the prosecution did not "fall outside of the proscribed limits of the discretionary control of the executive over the prosecution of criminal cases." United States v. Ahmad, 347 F.Supp. 912, 928 (M.D. Pa.1972).

Appellants claim that the evidence they presented discloses that some one hundred F.B.I. agents were arrayed outside of a New York City church on April 21, 1970, for the purpose of capturing a brother of the priest appellant, one Daniel Berrigan, who had been convicted on another charge and had failed to appear for sentencing;[7] that thereafter agents surveilled Sister McAlister for the purpose of locating Father Daniel Berrigan, and that this surveillance ceased after his arrest; that the government had a "chagrin and concern over the publicity surrounding Daniel Berrigan's fugitive status;"[8] that by August, 1970, the government had in its possession the critical evidence supporting the convictions now under review; that by Labor Day the government had the letter suggesting a plot to kidnap Dr. Kissinger, yet no investigation was underway commensurate with the charges later made by F.B.I. Director J. Edgar Hoover before a Senate appropriations subcommittee in November, 1970, and the subsequent publicity surrounding these statements.[9]

---

6. As a result of the relatively recent "criminal law revolution," extensive hearings, ancillary to the trial itself, have become commonplace in today's criminal proceedings. Pre-trial challenges to indictments, hearings challenging reception of evidence, and elaborate post-conviction hearings, often raise both constitutional questions and issues of fact. What we are experiencing today in the realm of federal criminal procedure had no counterpart in the common law jurisdictions at the time of the adoption of the Constitution. Indeed, the Bill of Rights, the fountainhead of most of these proceedings, was not incorporated into the original draft of the Constitution. Therefore, it cannot be successfully maintained that there was practice and precedent in 1789 suggesting that the resolution of the fact issue presented here was entrusted to a jury.

7. *See* United States v. Moylan, 417 F.2d 1002 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970).

8. Brief for appellants at 11.

9. Mr. Hoover's statement before the subcommittee alleged:

> Willingness to employ any type of terrorist tactics is becoming increasingly apparent among extremist elements. One example has recently come to light involving an incipient plot on the part of an anarchist group on the east coast, the so-called "East Coast Conspiracy to Save Lives".
>
> This is a militant group self-described as being composed of Catholic priests and nuns, teachers, students and former students who have manifested opposition to the war in Vietnam by acts of violence against Government agencies and private corporations engaged in work relating to U. S. participation in the Vietnam conflict.
>
> The principal leaders of this group are Philip and Daniel Berrigan, Catholic priests who are currently incarcerated in the Federal Correctional Institution at Danbury, Connecticut, for their participation in the destruction of Selective Service records in Baltimore, Maryland, in 1968.
>
> This group plans to blow up underground electrical conduits and steam pipes serving the Washington, D. C., area in order to disrupt Federal Government operations. The plotters are

In sum, appellants contend "they were prosecuted for conspiracy and smuggling of letters in [an] attempt to vindicate the reputation of the former Director of the Federal Bureau of Investigation and because of their outspoken views and position of leadership in deeply opposing the war in Viet Nam." [10] We have carefully considered the various contentions and accompanying evidence in support of appellants' argument of discriminatory prosecution. We find no error in their rejection by the district court. There was sufficient evidence supporting a *prima facie* case of conspiracy to kidnap Dr. Kissinger, to destroy the underground heating system in Washington, and to interfere with the Selective Service System by engaging in draft board raids. A fair reading of the letters involved in this appeal persuades us that they were germane to the matters which form the substance of the prosecution. Appellants contend that the prosecution was contrived as an attempt to rationalize Director Hoover's public statements of November, 1970. This contention implies that no serious investigation of appellants went forward prior to Hoover's statements. At the same time, however, appellants argue, "[b]y the end of August, 1970, the government already had in its possession the critical evidence supporting the convictions now under review." Thus even the most superficial analysis of appellants' basic argument reveals it to be self-contradictory and, therefore, self-destructive.

Without denigrating the importance of the right of a person accused of crime to establish the presence of discriminatory prosecution, central to the issue must be some initial showing that there is a colorable basis for the contention. Appellants attempted at the trial level to isolate the prosecutions under § 1791 from the charges of conspiracy and charges of the overt acts of planning the kidnap of Dr. Kissinger, the disruption of the Selective Service System, and the destruction of the underground heating system in Washington. They renew this attempt here. Were we to accept this approach, we would be applying judicial blinders to the realities of the actual prosecution. There was ample evidence justifying initiation of the prosecution of these appellants:

In the letter forming the basis of Count IV, Government Exhibit 25, Father Berrigan discussed a code for use in the letters. "Sorry as hell that I missed the code—hellova wasteful stupidity on my part. But let's develop an axiom, viz—will check every regular letter of yours for the third word thing—the other is too hard. Do the same with mine—need to perfect the technique, and then too, periodically, there may be a need. Moreover, will get the Harlem address from Pete, and see if I can locate a mail drop while working outside." The priest then suggested to Sister McAlister plans to convince members of the National Guard "(1) that they resign their military status (2) that they make a unit, public resignation (3) that they join the movement. . . . As a capstone, the students can perhaps, be lead (sic) to the idea that occupying buildings, going nose to nose with cops & N.G. is passè—bad politics, bad tactics. They should shut down ROTC and begin to zapp Sel. Service in college and University towns. So the statement could address N. Guard & students."

In Government Exhibit 48, the Count IX letter, Sister McAlister reported to Father Berrigan:

Eq outlined a plan for an action which would say—escallated (sic) seriousness—& we discussed pros and cons for several hours. It needs much

also concocting a scheme to kidnap a highly placed Government official. The name of a White House staff member has been mentioned as a possible victim. If successful, the plotters would demand an end to United States

bombing operations in Southeast Asia and the release of all political prisoners as ransom. Intensive investigation is being conducted concerning this matter.

10. Brief for appellants at 11.

more thought & careful selection of personnel. To kidnap—in our terminology make a citizen arrest of—someone like Henry Kissinger. Him because of his influence as policy maker yet sans cabinet status, he would therefore not be as much protected as one of the bigger wigs; he is a bachelor which would mean if he were so guarded, he would be anxious to have unguarded moments where he could carry on his private affairs—literally & figuratively. To issue a set of demands, e. g. cessation of use of B 52's over N. Vietnam, Laos, Cambodia, & release of political prisoners. Hold him for about a week during which big wigs of the liberal ilk would be brought to him—also kidnapped if necessary (which, for the most part it would be)—& hold a trial or grand jury affair out of which an indictment would be brought. There is no pretense of these demands being met & he would be released after this time with a word that we're non-violent as opposed to you who would let a man be killed—one of your own—so that you could go on killing. The liberals would also be released as would a film of the whole proceedings in which, hopefully, he would be far more honest than he is on his own territory. The impact of such a thing would be phenomenal. . . . Think about it & maybe when I see you in Danbury I can get your thoughts as well as fill you in on where the plan lies.

In Government Exhibit 49, the Count X letter, Father Berrigan responded:

About the plan—the first time opens the door to murder—the Tupamaros are finding that out in Uruguay—I hope you are following them (last 2 issues of the Guardian). When I refer to murder it is not to prohibit it absolutely (violence against non-violence bag). It is merely to observe that one has set the precedent, and that later on, when govn't resistance to this sort of thing stiffens, men will be killed. More to the point, the project as you outlined it is bril-

liant, but grandiose. . . . Which is to say that grabbing the gentleman will take a force of perhaps 10 of your best people—guarding him, getting communications out, perhaps moving him 2 or 3 times within the week. Now, in addition, to grab a prosecution of liberals would take dozens more, making the network too wide. . . . Nonetheless, I like the plan and am just trying to weave elements of modesty into it. Why not coordinate it with the one against capitol utilities?—You should talk more thoroughly with the charge about this, or with Little Shane or Big Joe German. To disrupt them, and then grab the Brain Child—this would be escalation enough.

This comes off the top of my head. Why not grab the Brain Child, treat him decently, but tell him nothing of his fate—or tell him his fate hinges on the release of pol. people or cessation of the air strikes in Laos. Then have batteries of movement people—Brain Child blind folded (sic)—engage him on policy. After he has been taught (the consideration of his safety will make him more and more human in his answers) get it filmed and record it. One thing should be implanted in that pea brain—that respectable murderers like himself are no longer inviolable. (This should be done just before release.) And that if he doesn't work to humanize policy, the likes of him will be killed by less scrupulous people. Finally, that political prisoners are the best guarantee of his sweet skin's safety and that he better get them out of jail.

Taken along these lines, you have both a material and personal confrontation with the warmakers. The trick to pull off is to hit them very, very hard without giving them violence to react to, or to justify themselves with.

He can be blindfolded, and participants can wear stocking masks & disguise their voices. It could be done and brilliantly.

I would sic Eq on it immediately, but tie it in with the D.C. Fiasco, and keep his imagination under ropes.

Additionally, there was testimony that Philip Berrigan and Joseph Wenderoth entered underground tunnels in Washington, D.C. Boyd Douglas, an informer and courier of these letters, testified that Berrigan discussed with him the destruction of the utility system in Washington, D.C., and admitted that, prior to his arrest, he and Joseph Wenderoth had been in the tunnel system, posing as electrical engineers, and had gained access through the entrance at the Forestal Building. Douglas said that Wenderoth had admitted to the same. One John Millard testified that Wenderoth had discussed with him "a possible protest against the war which would involve a power failure in certain federal buildings."

A dispassionate review of this evidence reveals the appellants as individuals who planned to express a protest against the war in terms outside the parameters of First Amendment protected speech. They fashioned specific plans designed to disrupt the functions of government and enhance their revolutionary cause.

Appellants' scheme was, by its very nature, bizarre in concept and purposefully dramatic. The plan was unusual; indeed, it was unique. There is no historical precedent for the kidnapping of an American Presidential Advisor as a vehicle for demonstrating political or moral opposition to a given war.

The sensational quality of the plan runs counter to the critical ingredients in appellants' discriminatory prosecution argument. Appellants premise their argument on the proposition that smuggling letters out of prison is commonplace—so commonplace that very few prosecutions result therefrom—and, therefore, that this particular prosecution was discriminatory. The short answer to this contention is that the Kissinger kidnap plan and the Washington tunnel sabotage plan were not commonplace. Indeed, they were conceptualized because of their bizarre quality in order to capture the imagination of the nation, if not the world. Under such circumstances, and in light of the evidence presented at trial, the argument that this prosecution was based upon anti-war sentiments is hardly convincing.[11] Prima facie evidence of the conspiracy and the accompanying serious plans totally rebuts this frivolous contention. However idealistic and sincere, the motives of those who would violate federal law are immaterial in a prosecution therefor. United States v. Malinowski, supra, 472 F.2d at 855–856.

 It is the entire prosecution, and not an examination of its isolated parts, which must command the attention of a court considering the defense of discriminatory prosecution. When all of the circumstances of this prosecution are

---

11. Thus, this case is factually distinguishable from United States v. Falk, 479 F.2d 616 (7th Cir. 1973). There, appellant was prosecuted for failure to carry a draft card. He offered to prove that 25,000 Selective Service registrants had dispossessed themselves of their draft cards without being prosecuted, and that his prosecution was therefore discriminatory and intended to chill his anti-war activities. The court, over a strong dissent, held that appellant was entitled to a hearing on his claim. However, in Falk, the offense for which appellant was indicted was certainly commonplace. Clearly, the same cannot be said for the instant case. Secondly, the Falk court found "unrebutted evidence . . .

[which] . . . made out at least a prima facie case of improper discrimination in enforcing the law." 479 F.2d at 623. Appellants here, on the other hand, have submitted no convincing evidence of discriminatory prosecution. Indeed, the court in Falk premised the granting of a hearing upon an allegation of "intentional, purposeful discrimination," and the existence of "facts sufficient to raise a reasonable doubt about the prosecutor's purpose." Id. Appellants were given the opportunity both at trial, and at a special, post-trial evidentiary hearing, to present facts tending to demonstrate that the prosecution was discriminatory. They failed to do so.

considered, the prosecution under § 1791 was a justifiable aspect of the entire prosecution, viz., the conspiracy, the overt acts, and the violation of § 1791.

## C.

 Appellants seem to recognize that they have marshalled little substantive evidence of discriminatory prosecution, and urge that the trial court aborted and frustrated their attempts at proof. Specifically, they complain of objections to their cross-examination of Associate Warden Hendricks, and Assistant United States Attorney Harry A. Nagle, Jr. They also unsuccessfully attempted to make the government's trial prosecutors witnesses, as well as the prosecutor who handled the original indictment. The court sustained the government's objection to any testimony by the attorneys most intimately involved in the prosecution. In addition, the defense subpoenaed all documents in the government's files dealing with the decision to investigate and prosecute the case. A government motion to quash the subpoenas was granted.[12]

Chief Justice (then Circuit Judge) Burger, writing for the court in Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479, 480 (1967), observed that "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." This basic principle of general application is premised on a recognition of the constitutional separation of powers. United States v. Cox, 342 F.2d 167 (5th Cir. 1965).[13] There is a broad body of law recognizing the practical and legal necessity of vesting broad discretion in the government's attorneys with respect to their enforcement of the federal criminal laws.[14]

The cases recognize the various factors which influence the executive branch's decision to prosecute.

. . . [Some of the] considerations are the likelihood of conviction, turning on choice of a strong case to test uncertain law, the degree of criminality, the weight of the evidence, the credibility of witnesses, precedent, policy, the climate of public opinion, timing and the relative gravity of the offense. In weighing these factors, the prosecutor must apply responsible

12. The warden was asked whether he knew "that it has always been the firmest and most important federal bureau of prisons' policy never to permit any prisoner to act as a government agent or informant while he was in prison." By this, the appellants sought to prove not only that the policy existed, but that it had been violated in this case, and that deviation from that policy raised an inference of discriminatory treatment. At a post-trial hearing on discriminatory prosecution the defense again sought to prove the same issue through the testimony of the Deputy Director of the Bureau of Prisons. Through Nagle, the appellants sought to show that the government declined to prosecute Boyd Douglas, the government informer. We find no prejudicial error in any of the rulings of the trial court regarding this issue.

13. "It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions." United States v. Cox, supra, 342 F.2d at 171.

14. See e. g., United States v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920); United States v. Rickenbacker, 309 F.2d 462 (2d Cir. 1963); Moss v. Hornig, 314 F.2d 89 (2d Cir. 1963); Sanders v. Waters, 199 F.2d 317 (10th Cir. 1952); Grell v. United States, 112 F.2d 861 (8th Cir. 1940); United States v. Manno, 118 F.Supp. 511 (N.D.Ill. 1954); Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915 (1968); Newman v. United States, 127 U.S.App. D.C. 263, 382 F.2d 479 (1967); Peek v. Mitchell, 419 F.2d 575 (6th Cir. 1970); Confiscation Cases, 74 U.S. (7 Wall.) 454, 19 L.Ed. 196 (1868); Moses v. Kennedy, 219 F.Supp. 762 (D.D.C.1963); Goldberg v. Hoffman, 225 F.2d 463 (7th Cir. 1955); Pugach v. Klein, 193 F.Supp. 630 (S.D.N.Y.1961); and United States v. Brokaw, 60 F.Supp. 100 (S.D.Ill.1945).

standards, based, not on loose assumptions, but, on solid evidence balanced in a scale demanding proof beyond a reasonable doubt to overcome the presumption of innocence . . . Still other factors are the relative importance of the offense compared with the competing demands of other cases on the time and resources of investigation, prosecution and trial. All of these and numerous other intangible and imponderable factors must be carefully weighed and considered by the conscientious United States Attorney in deciding whether or not to prosecute. All of these considerations point up to the wisdom of vesting broad discretion in the United States Attorney.

Pugach v. Klein, *supra*, 193 F.Supp. at 635.

 We find no error in the court's refusal to permit examination of the government lawyers. We agree with the district court's holding that testimony concerning the decision to decline prosecution of Boyd Douglas was completely irrelevant to the issue of whether these appellants were the victims of impermissible discrimination. 347 F.Supp. at 930.

In quashing the subpoenas for all government files relating to the decision to investigate and seek indictments in this case, and all files relating to decisions to prosecute any violations of 18 U.S.C. § 1791, the district court held that the appellants failed "to present evidence from which at least an inference of the use of improper standards can be drawn." 347 F.Supp. at 928. The court stated: "It is clear that through these subpoenas defendants are attempting to circumvent a long-accepted intolerance toward judicial inquisition into the process whereby prosecutorial decisions are formulated. United States v. Cox, *supra;* Spillman v. United States, *supra* [413 F.2d 527 (9th Cir.), cert. denied, 396 U.S. 930, 90 S.Ct. 265, 24 L.Ed.2d 228 (1969)]." 347 F. Supp. at 929.

 On appeal, the standard of review is whether the district court abused its discretion. Gevinson v. United States, 358 F.2d 761, 766 (5th Cir.), cert. denied, 385 U.S. 823, 87 S.Ct. 51, 17 L.Ed.2d 60 (1966). It is well established that the executive branch is privileged not to disclose intra-governmental documents reflecting advisory opinion, recommendations and deliberations comprising part of a process by which governmental decisions are formulated. Environmental Protection Agency v. Mink, 410 U.S. 73, 85, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973). The privilege is based upon the public policy of encouraging open, frank discussions between subordinate and chief concerning administrative action, and on the constitutional principle of separation of powers. *See, e. g.,* United States v. Cox, *supra.* Exemption (5) of the Freedom of Information Act, 5 U.S.C. § 552(b)(5), was enacted to reflect this privilege. Ackerly v. Ley, 137 U.S.App.D.C. 133, 420 F. 2d 1336, 1340 (1969). *See also* Environmental Protection Agency v. Mink, *supra,* 410 U.S. at 86, 93 S.Ct. at 835. With exceptions not relevant here, Rule 16(b), F.R.Cr.P., specifically exempts from discovery, "reports, memoranda, or other internal government documents made by government agents in connection with the investigation or prosecution of the case. . . ." Moreover, Rule 17(c), F.R.Cr.P., provides that the court may quash a subpoena if compliance would be unreasonable or oppressive. The district court acted within the strictures of that rule. These subpoenas were without factual basis, and were aimed at internal government documents relating to the decision-making process.

We agree with the district court that appellants failed to meet their burden of proving a colorable entitlement to the defense of discriminatory prosecution so as to entitle them to the desired testimonial and documentary evidence. *See* United States v. Dubrow, 201 F.Supp. 101, 104 (D.Mass.1962); United States v. Charamella, 294 F.Supp. 280 (D.Del.

1968). We specifically hold that there was no abuse of discretion by the district court. In sum, we are persuaded that appellants' argument on discriminatory prosecution, in all respects, is without merit.

## II.

Appellants contend that 18 U.S.C. § 1791 constitutes an unconstitutional delegation of legislative power without standards or guidelines in violation of Article 1, Section 1 of the Constitution, and the due process clause, and that it is unconstitutionally vague and overbroad.

## A.

The power to fashion rules governing the movement of contraband as it relates to the federal prison system resides with Congress. Implementation of congressional enactments in this sphere, such as § 1791, is the duty of the Attorney General. In this case, the Attorney General has delegated this power of implementation to individual prison wardens. The crucial flaw in this scheme, appellants suggest, is that this particular statute contains no guidelines or standards to regulate the Attorney General's authority, and, as such, is simply a naked grant of power. Accordingly, appellants rely upon the principle that Congress cannot delegate unfettered discretion to administrative agencies to promulgate regulations enforceable by criminal sanctions, and the corollary that the exercise of administrative ability must be governed by the guidelines provided by Congress.

This same argument was presented to, and rejected by, the Tenth Circuit in Carter v. United States, 333 F.2d 354, 355 (10th Cir. 1964). We accept the holding of that court and the reasoning employed by Chief Judge Murrah:

We know, of course, that Congress may not penalize the violation of an administrative rule or regulation which it has no constitutional power to authorize. See: Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; and Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570. It is equally clear, we think, that Congress may penalize the violation of an administrative rule or regulation which it is constitutionally empowered to authorize. See: United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563. In the exercise of its lawmaking function, Congress has committed to the Attorney General the "control and management" of Federal penal and correctional institutions, and has vested him with the duty and authority to "promulgate rules for the government thereof." 18 U.S.C. § 4001. In the performance of his statutory duty, the Attorney General undoubtedly may provide by regulation that nothing shall be brought into or taken out of a Federal penal institution without the knowledge and consent of the warden or superintendent of such institution. And, the regulation does not lose its administrative character simply because Congress has seen fit to make its violation a public offense. See: United States v. Grimaud, ibid; and United States v. Ruckman, D.C., 169 F.Supp. 160. The validity of the regulation is unquestioned here—the power of Congress to penalize its violation is unquestionable.[15]

*See also* Fulwood v. Alexander, 267 F.Supp. 92, 94–95 (M.D.Pa.1967), and

---

15. In United States v. Ruckman, 169 F. Supp. 160, 163–164 (S.D.W.Va.1959), the court upheld the validity of both § 1791 and the regulation implementing it:

The Attorney General has by regulation prohibited the trafficking of any thing unless the Warden or Superintendent gives consent, a reasonable regulation enabling the men in charge of the various institutions to know what is coming in or going out of their prisons. The regulation clearly limits itself to the authority delegated by the Act of Congress, and it certainly cannot be urged that the Attorney General must personally exercise the discretion of determining what may or may not enter each of our Federal prisons.

United States v. White, 295 F.Supp. 893, 893–894 (M.D.Ga.1968).

### B.

We can rapidly dispose of appellants' second contention that the statute is void for vagueness. Recently, this court discussed in detail the various concepts underlying the constitutional vagueness doctrine. Levy v. Parker, 478 F.2d 772 (3d Cir., 1973). Appellants rely on United States v. Pennsylvania Industrial Chemical Corp., 461 F.2d 468 (3d Cir. 1972), modified and remanded, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), suggesting that a statute which is linguistically clear may be rendered unconstitutionally vague because it simply cannot mean what it purports to mean. We are not persuaded that the comparison is appropriate. The regulation in question admits of no ambiguity whatsoever. It gives clear, concise and fair notice of what is prohibited.

Moreover, we are satisfied that both appellants knew of its provisions. When Father Berrigan entered Lewisburg, he signed a visitor and correspondence list which indicated that inmates would not be permitted to write to or receive mail from any person not on the approved list. This document also authorized the warden or his representative to open, read and inspect all mail. Furthermore, a booklet made available to new inmates outlined the correspondence regulations, and warned that "any attempt to 'kite' letters out of the institution will be considered a serious infraction and may be subject to prosecution." Sister McAlister signed a visitor's document which contained a statement warning that 18 U.S.C. § 1791 prohibited the taking of anything into or out of the prison without the knowledge and consent of the warden. We reject appellants' vagueness contention as being totally without merit.

Appellants' contention that the statute is overbroad is founded on the general rule that a statute is tainted if the conduct it prohibits includes protected activity as well as criminal conduct. "In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). *See also* United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). The minor premise proceeds that certain communications cannot constitutionally be excluded from prisons. *See, e. g.*, Jackson v. Godwin, 400 F.2d 529 (3rd Cir. 1968); Rowland v. Jones, 452 F.2d 1005 (8th Cir. 1971); Fortune Society v. McGinnis, 319 F.Supp. 901, 905 (S.D.N.Y. 1970), and other cases upholding a prisoner's right to send and receive various types of correspondence and literature. Because prisoners enjoy the right to send and receive mail, appellants conclude that this statute is overbroad because it makes criminal certain acts protected by the First Amendment.

It hardly deserves extended discussion to observe that appellants' syllogism strains to a conclusion which is invalid and illicit.[16] At issue is not the right of a prisoner to send or receive mail; rather, it is the right of a warden to establish an authorized channel of communications for the sending or receipt of this mail. Assuming, without deciding, that a prisoner has an unqualified right to send and receive all mail, there is no allegation that prisoner Berrigan's right to send or receive mail was denied him. Therefore, as we said in Veterans and Reservists for Peace in Vietnam v. Regional Commissioner of Customs, 459 F. 2d 676, 681 n. 8 (3d Cir. 1972), there exists a serious question whether appellants have standing to raise the argu-

16. Perhaps appellants' argument can best be described as a logical (or, more appropriately, illogical) quadruped because it excludes the additional minor premise that a prisoner's mail was denied him.

ment that the statute is void for overbreadth because it might be utilized to restrict materials protected by the First Amendment.

Prescinding, however, from this serious question, and addressing ourselves to the merits of appellants' contention, this court has previously held that "imprisonment unavoidably results in the forfeiture of certain rights and privileges commonly exercised in a free society. The loss of these rights has been recognized by the Supreme Court as 'a retraction justified by the considerations underlying our penal system.' Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). Stated simply, a man in jail is not a free man; the denial of his right to drink fully from the cup of freedom is the very hypostasis of confinement. . . . And, unpleasant as it is to contemplate the physical restrictions of a 'settled environment', we must also recognize that even those rights which survive penal confinement may be diluted by peculiar institutional requirements of discipline, safety, and security. To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests." Gittlemacker v. Prasse, 428 F.2d 1, 3–4 (3d Cir. 1970).

The presence of "an important or substantial government interest . . . unrelated to the suppression of free expression" has been held to "justify incidental limitations on First Amendment freedoms." United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678–1679, 20 L.Ed.2d 672 (1968). Using the O'Brien test, the district court reasoned;

A letter is essentially neutral, made dangerous or innocuous by its author. Given the potential of a letter—to transmit escape plans, etc.—the warden must know of its contents before passing judgment on its suitability for importation into or exportation from the prison . . . This court concludes that 18 U.S.C. § 1791 meets each of the requisites set down in O'Brien. . . . The interest involved is an "important and substantial" one and unrelated to the suppression of free speech. By definition there is a distinction between "incidental limitations" on speech and its suppression. This statute and case present examples of an incidental limitation, at most, and a limitation no greater than that absolutely required for the furtherance of safe and efficient prison maintenance. This court, therefore, rejects defendants' attack on the constitutionality of 18 U.S.C. § 1791.

United States v. Ahmad, supra, 347 F. Supp. at 919–920.

■ Therefore, even if the First Amendment issue were properly before us, we would agree with the district court's analysis and its rejection of the contention. See also Nolan v. Fitzpatrick, 451 F.2d 545, 548 (1st Cir. 1971).

### III.

Appellants' contentions that the judgments of conviction on Counts V through X must be reversed because the government failed to prove all elements of the crime presents a very serious and difficult question. In these counts they were charged with and convicted of attempts to violate § 1791. Unlike the circumstances attending Father Berrigan's dispatch of the Count IV letter, which occurred prior to any knowledge on the part of the warden, it is undisputed that the prison officials had prior knowledge of letters embraced by these convictions.[17]

---

17. On cross-examination, Robert L. Hendricks, Associate Warden of Lewisburg, was asked:

Q. Now, did you know that Douglas was carrying letters in and out while he was on study-release, in and out of the penitentiary—unauthorized letters?

A. After we intercepted the first letter, from that point on I knew that he was.

Hendricks reaffirmed this statement several times during his testimony, eventual-

## A.

We begin with the proposition that the Constitution requires proof beyond a reasonable doubt of all elements of an offense in order to sustain a conviction. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). One of the elements of a violation of § 1791 is the absence of "knowledge and consent of the warden or superintendent of [the] federal penal or correctional institution." 28 C.F.R. § 6.1. From this, the defense reasons that if the warden knows of the smuggling, the purpose of the law is satisfied and no crime can exist. The district court rejected this argument holding that "[s]uch an interpretation of the statute is unjustified and inaccurate. . . . The intent of the parties to bypass prison channels and smuggle the letters, combined with action toward that goal is sufficient to complete a punishable offense. . . . The intent of the party committing the offense to deprive the warden of knowledge of such smuggling seems to this court to be the gravamen of the offense." 347 F.Supp. at 920.

In support of its conclusion that intent to commit the offense plus some overt act constituted the crime, irrespective of legal impossibility to commit the crime, the district court relied on New York Penal Law, McKinney's Consolidated Laws c. 40, § 110.10; United States v. Thomas, 13 U.S.C.M.A. 278, 32 C.M.R. 279 (1962); Hall, General Principles of Criminal Law, 586 (2d Ed. 1960); Perkins, Criminal Law, 489 (1957); and the Model Penal Code, Art. 5, § 501.

The first difficulty we have in accepting this analysis is that it utilized criminal codes which contain provisions having no counterpart in existing federal criminal law. Federal criminal law is purely statutory; there is no federal common law of crimes. Levy v. Parker, *supra*, 478 F.2d at 796. The Model Penal Code provides that a person is guilty of an attempt "if acting with the kind of culpability otherwise required for commission of the crime he: (a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be." The proponents of the code report that "[t]he purpose of paragraph 1(a) is to eliminate legal impossibility as a defense to an attempt charge."[18] Absent such statutory language, courts have held that a person accepting goods which he believed were stolen, but were not actually stolen goods, was not guilty of an attempt to receive stolen goods;[19] that an individual who offered a bribe to a person whom he believed to be a juror, but who was not a juror, could not be said to have attempted to bribe a juror;[20] and, that a hunter who shot a stuffed deer, believing it to be alive, had not attempt-

---

ly admitting that after June 3, 1970, he knew Douglas was carrying letters in and out of the prison. All of the letters involved in Counts V to X were exchanged after June 3.

18. Wechsler, Jones & Korn, The Treatment of Inchoate Crimes In The Model Penal Code Of The American Law Institute: Attempt, Solicitation, And Conspiracy, 61 Colum.L.Rev. 572, 578 (1961).

19. *See, e. g.,* People v. Jaffe, 185 N.Y. 497, 78 N.E. 169 (1906), where the court said that the following actions do not constitute attempts: voting with the belief that one is under the permissible age when in fact he is not under age; having sexual intercourse with a female with the belief that she is under the age of consent when in fact she is not under the age of consent. The holding of the *Jaffe* case was approved in People v. Jelke, 1 N.Y.2d 321, 329, 152 N.Y.S.2d 479, 485–486, 135 N.E.2d 213, 218 (1956), where the court likened the situation to "selling oil stock and being surprised to discover that oil was actually in the ground where the accused vendor had represented but not believed it to be."

20. State v. Taylor, 345 Mo. 325, 133 S.W. 2d 336 (1939); State v. Porter, 125 Mont. 503, 242 P.2d 984 (1952). Similarly, attempted bribery may not be based upon an offer of a bribe to an official who cannot render the requested service. State v. Butler, 178 Mo. 272, 77 S.W. 560 (1903). *See also* State v. Lawrence, 178 Mo. 350, 77 S.W. 497 (1903).

ed to kill a deer out of season.[21] Faced with these holdings, the Model Penal Code proponents suggested that courts were exonerating defendants "in situations where attempt liability most certainly should be imposed." Hence, they felt necessity for the statute.

The National Commission on Reform of Criminal Laws, also recognizing this apparent void in the existing federal criminal code, has proposed a general attempt statute, applicable to every federal offense. Its proposal closely resembles that of the Model Penal Code: "Factual or legal impossibility of committing the crime is not a defense if the crime could have been committed had the attendant circumstances been as the actor believed them to be." § 1001(1). Other measures presently before Congress contain similar provisions. *See* § 1–2A4(c), Criminal Attempt, Defense Precluded, S.1, Criminal Justice Codification, Revision and Reform Act of 1973, 93rd Cong., 1973; § 1001(b), Criminal Attempt, Defense Precluded, H.R. 6046; S. 1400, Criminal Code Reform Act of 1973, 93rd Cong., 1973.

Indeed, we are informed that elimination of impossibility as a defense to a charge of criminal attempt, as suggested by the Model Penal Code and the proposed federal legislation, is consistent with "the overwhelming modern view,"[22] and with criminal provisions in such diverse parts as Canada, India and New Zealand.[23]

Nevertheless, the brute fact remains that present federal criminal statutes do not contain this provision. And for this court to uphold these convictions in the absence of such statutory authority would be to impose criminal liability upon mere intent, where the will is to be taken for the deed, "or, as expressed in the Latin formula appearing in the Year Books, *Voluntas reputabitur pro facto*."[24]

Professor Williams asserts that "[i]t should need no demonstration that a person who commits or attempts to commit what is not a crime in law cannot be convicted of attempting to commit a crime, and it makes no difference that he thinks it is a crime."[25] Professor Hall[26] is equally insistent that to make such conduct a criminal attempt would violate the principle of legality.[27]

█ Moreover, whatever be the approach taken in those jurisdictions utilizing the common law of crimes, except as modified by statute, *e. g.*, Pennsylvania, the interstices of federal criminal law cannot be filled by resort to common law precedents. It cannot be overemphasized that conduct intended to be prohibited by federal law must be explicitly prohibited by statutory authority.

21. State v. Guffey, 262 S.W.2d 152 (Mo. Ct.App.1953). *See generally* Wechsler, Jones & Korn, *supra* note 18, at 578–585.

22. Working Papers of the National Commission on Reform of Federal Criminal Laws, Vol. 1, 360 (1970).

23. Wechsler, Jones & Korn, *supra* note 18, at 578–579.

24. Sayre, Criminal Attempts, 41 Harv.L. Rev. 821 (1928).

25. G. Williams, Criminal Law, The General Part, 633 (2d Ed. 1961).

26. J. Hall, General Principles of Criminal Law, 586 (2d Ed. 1960).

27. We have recently emphasized as "the fundament of American law [the principle] 'that no person can be criminally punished except by judicial process and unless the acts for which he was punished were clearly forbidden . . . .' The codification of definite rules in the law of crimes is considered by many in Western democratic societies as a fundamental requirement of liberal democracy. "They take their stand on the principle that no one shall be punished for anything that is not expressly forbidden by law. *Nullum crimen, nulla poena, sine lege.* They regard that principle as their great charter of liberty." A. Denning Freedom Under Law 41 (1949).'" Levy v. Parker, *supra*, 478 F.2d at 791.

## B.

It becomes necessary, therefore, to turn to the rudiments of the law of attempt. "Some words of definition are necessary. For convenience of usage the following terms shall be used as indicated: *Act*—the defendant's physical bodily movements; *Circumstances or attendant circumstances*—the external, objective situation which the substantive law may require be present in addition to the defendant's act before he can be convicted of the substantive crime; *Conduct*—the act combined with the circumstances regarded by the substantive law as relevant; *Consequences* or *result*—an additional occurrence caused by the defendant's act."[28]

We reduce the law of attempt to these basic components because it is a subject that has long attracted the attention of the commentators and legal historians producing a wealth of legal literature.[29] The problems have been called "much-mooted,"[30] "intricate and difficult,"[31] "one of the most interesting and difficult problems of the criminal law,"[32] reflecting "ambivalence as to how far the governing criteria should focus on the dangerousness of the actor's conduct,"[33] and exerting "a fascination for legal scholars far beyond their significance in terms of the number of litigated issues."[34]

Emanating from the many thoughtful observations and the multitude of case law are the following teachings. (1) We must not generalize in the law of attempt. (2) There is a basic distinction between early common law decisions and those beginning in the latter Eighteenth Century. (3) There is a distinction between the holdings in common law jurisdictions and those which have codified the law of attempt. (4) One of the most sophisticated areas of the troublesome law of attempt is that which must command our attention here—legal impossibility of criminal attempt.

Indeed, even a decision to analyze impossibility on the basis of what is generally described as the two categories of factual impossibility and legal impossibility presents serious problems unless conceptual distinctions between the two labels are recognized and respected.

28. Enker, Impossibility In Criminal Attempts—Legality And The Legal Process, 53 Minn.L.Rev. 665 (1969). For a similar analysis, see Sayre, *supra* note 24, at 838: "[E]very attempt involves three factors: (1) some act on the part of the defendant, (2) the particular consequence which the defendant intended or which formed the object of his act, and (3) the actual consequences which in fact ensued."

29. Beale, Criminal Attempts, 16 Harv.L. Rev. 491 (1903); Hoyles, The Essentials of Crime, 46 Can.L.J. 393, 404 (1910); Cook, Act, Intention and Motive In The Criminal Law, 26 Yale L.J. 645 (1917); Sayre, Criminal Attempts, 41 Harv.L. Rev. 821 (1928); Tulin, The Role of Penalties In Criminal Law, 37 Yale L.J. 1048 (1928); Arnold, Criminal Attempts—The Rise And Fall Of An Abstraction, 40 Yale L.J. 53 (1930); Strahorn, The Effect of Impossibility On Criminal Attempts, 78 U. of Pa.L.Rev. 962 (1930); Curran, Criminal And Non-Criminal Attempts, 19 Geo.L.J. 185, 316 (1931); Derby, Criminal Attempt—A Discussion Of Some New York Cases, 9 N.Y.U.L.Q. 464 (1932); Turner, Attempts To Commit Crimes, 6 Camb.L.J. 230 (1934); Blackburn, Solicitation To Crimes, 40 W.Va.L.Q. 135 (1934); Skilton, The Mental Element In A Criminal Attempt, 3 U.Pitt.L.Rev. 181 (1937); Skilton, The Requisite Act In A Criminal Attempt, 3 U.Pitt.L.Rev. 308 (1937); Hitchler, Criminal Attempts, 43 Dick.L. Rev. 211 (1939); Strahorn, Preparation For Crime As A Criminal Attempt, 1 Wash. & Lee L.Rev. 1 (1939); Hall, Criminal Attempt—A Study of Foundations Of Criminal Liability, 49 Yale L.J. 789 (1940); Edwards, Criminal Attempts, 15 Mod.L.Rev. 345 (1952); Keedy, Criminal Attempts At Common Law, 102 U. of Pa.L.Rev. 464 (1954). Perkins, Criminal Attempt And Related Problems, 2 U.C.L.A.L.Rev. 319 (1955).

30. Strahorn, *supra* note 29, at 962.

31. Perkins, *supra* note 29, at 319.

32. Keedy, *supra* note 29, at 464.

33. Wechsler, Jones & Korn, *supra* note 18, at 574.

34. Enker, *supra* note 28, at 665.

Generally speaking factual impossibility is said to occur when extraneous circumstances unknown to the actor or beyond his control prevent consummation of the intended crime. The classic example is the man who puts his hand in the coat pocket of another with the intent to steal his wallet and finds the pocket empty. Regina v. Collins, 9 Cox Crim. Cas. 497 (1864). Generally, the cases which have imposed criminal liability for attempt where factual circumstances precluded commission of the intended crime have emphasized, as a primary requisite, proof of an intent to commit a specific crime.

 Legal impossibility is said to occur where the intended acts, even if completed, would not amount to a crime. Thus, legal impossibility would apply to those circumstances where (1) the motive, desire and expectation is to perform an act in violation of the law; (2) there is intention to perform a physical act; (3) there is a performance of the intended physical act; and (4) the consequence resulting from the intended act does not amount to a crime.[35]

Were intent to break the law the sole criterion to be considered in determining criminal responsibility—and this was the approach utilized by the district court—we could sustain the conviction of appellants on Counts V to X. Clearly, it can be said that Father Berrigan intended to send letters to Sister Mc-Alister, and vice versa. Normally, of course, the exchange of letters is not a federal offense. Where one of the senders is in prison, however, the sending may or may not be a criminal offense. If the letter is sent within normal channels with the consent and knowledge of the warden it is not a criminal offense. Therefore, an attempt to send a letter through normal channels cannot be considered an attempt to violate the law because none of the intended consequences is in fact criminal. If the letter is sent without the knowledge and consent of the warden, it is a criminal offense and so is the attempt because both the intended consequence and the actual consequence are in fact criminal. Here, we are faced with a third situation where there is a motivation, desire and expectation of sending a letter without the

---

35. Intent as used in this connection must be distinguished from motive, desire and expectation. If C by reason of his hatred of A plans to kill him, but mistaking B for A shoots B, his motive, desire and expectation are to kill A but his intent is to kill B. If a married man forcibly has intercourse with a woman whom he believes to be his wife's twin sister, but who in fact is his wife, he is not guilty of rape because his intent was to have intercourse with the woman he attacked, who was in fact his wife. If A takes an umbrella which he believes to belong to B, but which in fact is his own, he does not have the intent to steal, his intent being to take the umbrella he grasps in his hand, which is his own umbrella. If a man, mistaking a dummy in female dress for a woman, tries to ravish it he does not have the intent to commit rape since the ravishment of an inanimate object cannot be rape. If a man mistakes a stump for his enemy and shoots at it, notwithstanding his desire and expectation to shoot his enemy, his intent is to shoot the object aimed at, which is the stump.

Keedy, supra note 29, at 466–467.

Wharton puts the following case: "Lady Eldon, when traveling with her husband on the Continent, bought what she supposed to be a quantity of French lace, which she hid, concealing it from Lord Eldon in one of the pockets of the coach. The package was brought to light by a custom officer at Dover. The lace turned out to be an English manufactured article, of little value, and of course, not subject to duty. Lady Eldon had bought it at a price vastly above its value, believing it to be genuine. . . ."

Wharton opined that Lady Eldon had the intent to smuggle this lace into England and was guilty of an attempt to smuggle. 1 Wharton, Criminal Law, 304 n. 9 (12th Ed. 1932). Professor Keedy suggests: "The fallacy of this argument is found in the fact that the particular lace which Lady Eldon intended to bring into England was not subject to duty and therefore, although there was the wish to smuggle, there was not the intent to do so." Keedy, Id., at 476–477.

knowledge and consent, and the intended act is performed, but unknown to the sender, the transmittal is accomplished with the knowledge and consent of the warden.

Applying the principles of the law of attempt to the instant case, the writing of the letters, and their copying and transmittal by the courier, Boyd Douglas, constituted the *Act*. This much the government proved. What the government did not prove—and could not prove because it was a legal impossibility—was the "external, objective situation which the substantive law may require to be present," to-wit, absence of knowledge and consent of the warden. Thus, the government failed to prove the *"Circumstances or attendant circumstances"* vital to the offense. Without such proof, the *Consequence* or *Result* did not constitute an offense that violated the federal statute.[36] The warden and the government were aware of the existence of the letters. The courier acted with the consent of the warden. Although there was no entrapment, United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973),[37] the public authorities were privy to the *Act* which gave rise to these charges. There are many supporters of the view that irrespective of the absence of a nec-essary element of the offense prohibited by statute—the "external, objective situation which the substantive law may require be present"—criminal responsibility should attach "if the attendant circumstances were as [the actor] believes them to be." The bills presently before the Congress contain such a provision.[38] But the efforts of the distinguished scholars who drafted these proposals must be kept in perspective; they are recommending changes to fill an apparent void in existing law. They suggest a statutory change which would remove one of the elements of the offense which still must be proved under the present federal statutory law of crimes.

We are also aware that in those jurisdictions which permit the development of elements of the criminal law by the common law tradition of judicial decision, the courts have been willing to change the law through the centuries from an absolute defense of factual impossibility, to a jurisprudential environment which, though extremely complicated and confused, seems to be watering down, if not eliminating, the defense of factual impossibility. But as we have heretofore indicated, we will not fall into the trap of equating *legal* with *factual* impossibility in the law of criminal attempt.[39]

---

36. When we analyze the *Consequence* or *Result* of the *Act* and *Conduct* in this case, we find no barefaced public injuries present, which by the Eighteenth Century weakened the original absolutism of this defense at common law. Emphasizing that the contents of the letters are not germane to this issue, we do not recognize any serious danger to the public welfare to have resulted from these acts.

37. Nor was there error in the court's charge on entrapment.

38. See *supra* at 33.

39. Indeed, though it is not before us, we do evidence some concern that the proposed changes in the federal criminal code seem to fashion a new crime where the critical element to be proved is *mens rea simpliciter*. We detect the total lack of objective guidelines in the presentation of such proof or a defense. While *mens rea* is certainly within one's control it is not subject to direct proof; it is proved by circumstantial evidence only. More important, it is not subject to direct refutation. It is the subject of inference and speculation. We perceive the danger of potential abuse where the circumstances admit to very little objective measurement. More important, we are unwilling as a court to legislate by judicial fiat a crime consistent only with thought processes, as this is reminiscent of the German law of the Nazi period "that anything is punishable if it is deserving of punishment according 'to the fundamental conceptions of a penal law and sound popular feeling.'" H.L.A. Hart, Law, Liberty and Morality, 12 (1963).

■ In sum, we distinguish between the federal system, where criminal law is solely statutory, and jurisdiction patter upon the common law. "It is commonplace that federal courts are courts of limited jurisdiction, and that there are no common law offenses against the United States. 'The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence.' United States v. Hudson, 7 Cranch. 32, 34, 3 L.Ed. 259. 'It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms.' Todd v. United States, 158 U.S. 278, 282, 15 S.Ct. 889, 890, 39 L.Ed. 982". Keeble v. United States, 412 U.S. 205, 215, 93 S.Ct. 1993, 1999, 36 L.Ed.2d 844 (1973) Stewart, J., dissenting. We distinguish between the defense of factual impossibility, which is not involved here, United States v. Osborn, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), and legal impossibility, which is. Even were we to concede that factual impossibility of success may not prevent an attempt, there can be no crime of attempt where there is a legal impossibility to commit a crime. Simply stated, attempting to do that which is not a crime is not attempting to commit a crime.[40] Congress has not yet enacted a law that provides that intent plus act plus conduct constitutes the offense of attempt irrespective of legal impossibility. Until such time as such legislative changes in the law take place, this court will not fashion a new non-statutory law of criminal attempt.

Accordingly, the convictions on Counts V-X may not stand.

### IV.

■ Appellants have raised other contentions which, for the limited purposes remaining, apply only to Father Berrigan's conviction on Count IV. We have concluded that the court did not err in adopting Government Request No. 15, or in failing to include the phrase, out "of a federal penitentiary," when it charged that "defendant Philip Berrigan caused a letter to be sent to Elizabeth McAlister. . . ." Although no defense was presented by defendants, prior to resting they unsuccessfully moved the court to grant immunity, or to require the government to seek immunity, for any defense witnesses who might refuse to give testimony on grounds of self-incrimination when called. The court ruled it had no authority to grant such immunity or to demand that the government seek immunity for defense witnesses. We agree. See United States v. Smith, 436 F.2d 787 (5th Cir.), cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L. Ed.2d 142 (1971); United States v. Lyon, 397 F.2d 505 (7th Cir.), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L. Ed.2d 117 (1968); Morrison v. United States, 124 U.S.App.D.C. 330, 365 F.2d 521 (1966); Earl v. United States, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966).

Finally, we agree that the record discloses that the verdict was not "the product of mental and physical fatigue," United States v. Parks, 411 F.2d 1171, 1173 (1st Cir. 1969), or of "judicial coercion," United States v. Grosso, 358 F.2d 154, 159 (3d Cir. 1966), but rather of true deliberation.

The judgment of conviction of Philip Berrigan on Count IV will be affirmed. The judgments of convictions of Philip Berrigan and Elizabeth McAlister on Counts V through X will be reversed.

ROSENN, Circuit Judge (concurring).

I concur.

I agree there was insufficient evidence of a discriminatory prosecution to warrant vacating these convictions. We must be cognizant not only of the lack of evidence of improper motive but also of the content of the letters for which defendants were prosecuted.

40. Accord: United States v. Hair, 356 F.Supp. 339 (D.C. 1973).

The letter forming the basis for Count IV suggested that students be persuaded to "shut down ROTC and begin to zapp Sel. Service in college and university towns." It also suggested establishing a secret code to be used in future letters. As the majority opinion reveals, Counts IX and X involved letters from Sister McAlister and Father Berrigan, respectively, specifically discussing the idea of kidnapping Henry Kissinger. The important aspect of the convictions under review on this appeal is not that the alleged criminal conspiracy was "bizarre", but that the letters pertaining to it involved the participation of a prisoner in the planning of criminal activity. The prohibition against taking or sending anything into or out of a federal prison without the knowledge or consent of the warden is designed to guard against just this sort of conduct, as well as to prevent contraband from coming in and out of the prisons. Because letters aimed at the perpetration of criminal activity are an evil at which the regulation is aimed, I believe the Government had ample justification for its alleged selectivity in commencing prosecution. It is immaterial that the statute and regulation might not be enforced through prosecutions when prison authorities discover "innocent" letters being smuggled.

I also agree that the convictions of both defendants on Counts V through X should be vacated. The letters involved in these counts were all smuggled after June 3, 1970, i.e., after Warden Hendricks knew of Douglas's activities. I think the regulation of the Attorney General, 28 C.F.R. § 6.1 imports into the statutory attempt offense the essential element of absence of knowledge and consent by the warden.

The regulation provides:

The introduction or attempt to introduce into or upon the grounds of any Federal penal or correctional institution or the taking or attempt to take or send therefrom anything whatsoever without the knowledge and consent of the warden or superintendent of such Federal penal or correctional institution is prohibited.

The prohibition, as it applies to attempts, is ambiguous. It can be read to apply when there is an attempt to smuggle a letter with the belief that the warden does not know about it. Reading the regulation in this manner, the focus would be on the defendants' intent. On the other hand, it can be read to make the absence of the warden's consent or knowledge an absolute element of the attempt offense. Lacking any indication of the intent of those who framed the regulation, I feel compelled to follow the maxim that penal statutes are to be narrowly construed. I therefore accept the latter reading and, finding in the evidence no proof that the warden lacked knowledge of the smuggling attempts, agree that the Government failed to sustain its burden of proof on these six counts.