**UNITED STATES of America**

v.

**Hyacinthe T. NAPPER, Defendant.**

**No. 82 CR 0003 (ERN).**

United States District Court,
E.D. New York.

Dec. 14, 1982.

---

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Charles E. Rose, Asst. U.S. Atty., Brooklyn, N.Y., for United States.

Karr & Lyons by John W. Karr, Washington, D.C., and Somerstein & Pike by Mary Boresz Pike, New York City, for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Defendant Hyacinthe T. Napper is charged in a three-count indictment with using a forged or altered passport in violation of 18 U.S.C. § 1543, using a passport issued to another person in violation of 18 U.S.C. § 1544, and making fraudulent statements on a customs declaration in violation of 18 U.S.C. § 1001. Specifically, it is alleged that on January 3, 1981, Napper entered the United States at JFK Airport in Queens, New York, using a passport issued to one "LaFawn Snow," and that she signed the name "LaFawn Snow" on a customs declaration. On June 2, 1981, Napper's Maryland home was searched pursuant to a warrant and a United States passport was seized. The photograph affixed to the passport allegedly does not match the photograph included on the original passport application. Additionally, the name "Hyacinthe T. Napper" apparently had been erased from the back of the passport photograph and had been replaced with the signature "LaFawn Snow," purportedly in Napper's handwriting.

Napper claims that her prosecution was selectively brought as part of a concerted government effort to suppress the activities of the Original Hebrew Israelite Nation of Jerusalem, a religious organization commonly known as the Black Hebrews. She seeks either a Court ruling that she may present a selective prosecution defense to a jury at trial, or the immediate dismissal of this indictment pursuant to Rule 12(b)(1), F.R.Crim.P. If she is denied both these remedies, she requests discovery to develop a selective prosecution argument prior to a final determination of that issue.

■ The defendant does not have the right to present a selective prosecution claim to a jury. In attempting to establish a jury right in this instance, defendant cites cases that discuss the importance of a jury right generally, e.g., *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), from which she specifically analogizes a selective prosecution challenge to the entrapment defense. Unlike an entrapment claim, however, a selective prosecution challenge in no way determines the issue of a defendant's guilt or innocence. *E.g., United States v. Berrigan,* 482 F.2d 171 (3d Cir.1973). If impermissible selective prosecution is demonstrated, the indictment itself is fatally defective regardless of any evidence proving guilt. A selective prosecution claim is therefore a question of law properly determined only by the Court, and may not be argued before the fact-finders. *Id.* at 174–75.

■ Furthermore, defendant has not yet sufficiently demonstrated that she was indicted for impermissible reasons. Selectivity in prosecutorial decisions in general is permissible and even necessary. *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). To support a selective prosecution claim, defendant must further make a two-part showing that her prosecution was brought on improperly discriminatory grounds. The Second Circuit standard, established in *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974), states:

> "[A] defendant bears the heavy burden of establishing, at least prima facie, (1) that while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis

of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."

Defendant contends that the government chose to prosecute her based upon the "impermissible consideration" of religion. She cites Israeli policy discouraging the entry of Black Hebrews into Israel, and asserts that the United States has, at Israel's request, agreed to suppress Black Hebrew activity in this country. A brief review of Israel's Black Hebrew policy is necessary to understand defendant's claim.

Beginning in the late 1960's, small groups of American Black Hebrews arrived in Israel, claiming to be descendants of the original Hebrew tribes and seeking preferential treatment given to Jews under Israeli immigration law. The Black Hebrew organization originated in the United States, and continues fundraising activities in this country to encourage and finance immigration to Israel. As documented by a June 1980 Israeli Knesset report entitled "Report and Recommendations of the Committee of Inquiry into the Problem of the Black Hebrews" ("*Knesset Report*"), the Israeli government has extensively debated its sometimes inconsistent policy regarding the Black Hebrews. Essentially, Israeli authorities ultimately concluded that the Black Hebrews incorrectly claim to be of Jewish descent; therefore, Israeli immigration law will accord them status as Jews only if they convert. *Knesset Report* at 9–12.

Viewing themselves as presently Jewish, the Black Hebrews have refused to convert formally. *Id.* at 9–12. Absent preferential status, the Black Hebrews' presence in Israel appears to contravene Israeli law. *Id.* at 79–80. The long-standing questionable legal status of the Black Hebrews has forced them into undesirable living conditions and has created tense relations between the Black Hebrews and other Israelis. *Id.* at 19–20, 32–36. The Israeli government's de-liberations have been further colored by the Black Hebrews' apparent assertion that they, and not the current citizens and government, are entitled to occupy and rule the Israeli nation. *Id.* at 6–7, 55–59.

Efforts by the Israelis to halt the entry of the Black Hebrews or to expel the organization's members have been ineffective. *Id.* at 66–71. Responding to a continued flow of claimed fraudulently accomplished immigration, the Israelis have resorted to a concededly embarrassing policy of interrogating and often denying admission to many black Americans. *Id.* at 60, 69–70. After detailed investigation, the Israeli government has now apparently adopted a bifurcated policy: those Black Hebrews already present in Israel have been accorded certain legal rights and will be permitted to remain in that country, but no further immigration by Black Hebrews will be allowed. *Id.* at 95–111.

According to the *Knesset Report,* Israeli and American authorities have negotiated an agreement to assist any Black Hebrew who seeks to return to the United States. *Id.* at 68. Furthermore, federal agents apparently are also engaged in extensive investigations of suspected fraud, theft, and embezzlement offenses allegedly committed by some Black Hebrews to finance Israeli immigration. *Id.* at 50, 86. Whether United States policy and practice regarding the Black Hebrews extends beyond such activities, however, has not yet been demonstrated in any manner.

■ Defendant has thus far not met the requirements of either prong of the *Berrios* test. First, she has made no attempt to establish that she "has been singled out for prosecution," and that the government has not proceeded against "others similarly situated." Additionally, she has not proven that the government based its decision to prosecute her on impermissible considerations. In fact, defendant has neither stated that she is a member of the Black Hebrews, nor indicated why the government would believe that she is a Black Hebrew. She has elucidated Israel's undeniable policy of discouraging Black Hebrew activities, and

she has implied that Israel may have obtained some American cooperation. She has not, however, shown any American policy of suppressing the Black Hebrew movement and, more specifically, she has shown no invalid purpose for this prosecution. Defendant's selective prosecution claim does not support dismissal of this indictment at this time.

Defendant notes that certain information which might support a selective prosecution claim would exist, if at all, in the possession of the government. To develop further her selective prosecution argument, defendant requests that the Court compel disclosure of:

1. statistics which indicate how many alleged violations of 18 U.S.C. §§ 1001, 1543 & 1544 are brought to the government's attention every year;

2. statistics which indicate how many of those offenses are prosecuted;

3. the existence of any declination policies concerning the prosecution of such offenses;

4. communication between the Israeli government and U.S. officials that might have resulted in intensified investigation or prosecution of Black Hebrews.

■ A selective prosecution claim cannot be used by a defendant solely to obtain access to otherwise unavailable government documents. Thus the Second Circuit in *Berrios,* 501 F.2d at 1211, stated:

"In order to show . . . [a] 'colorable basis' entitling the defense to subpoena documentary evidence required to establish a selective prosecution defense . . . we would first require some evidence tending to show the existence of the essential elements of the defense and that the documents in the government's possession would indeed be probative of these elements."

The district court in *United States v. Washington,* 81 CR 375 (D.D.C. Feb. 23, 1982), applying the *Berrios* standard, denied a motion by the defendant, also a purported Black Hebrew charged with passport violations, for a presentation to the jury of the selective prosecution defense or for a dismissal of the indictment on the selective prosecution ground. The court granted an almost identical discovery request, however, stating:

"Notwithstanding the fact that the defendant has not established a prima facie case, she has provided sufficient evidence to lead this Court to conclude that the assertion of the defense *may* not be spurious and that she has demonstrated a colorable entitlement to discovery." *Id.,* slip op. at 7 (emphasis in original).

The court held that the prosecution, at its option, could submit the material to the defendant's counsel or to the court for an *in camera* review.

■ This Court is similarly persuaded that defendant has presented a " 'colorable basis' " justifying discovery to develop a possible selective prosecution challenge to this indictment. Certainly, Israel has a stated national policy of discouraging the Black Hebrew movement. Furthermore, although not demonstrably impermissible, the United States in some ways cooperated with Israel on the Black Hebrew issue, and has apparently undertaken independent investigations of the sect's activities. Defendant is entitled to pursue discovery of information which may prove that the government's conduct has impermissibly extended to utilizing criminal prosecutions to suppress religious activities.

It is self-evident that defendant's four-part discovery request concerns information that would be probative of a selective prosecution claim. *See id.,* slip op. at 7–8. The government, at its option, may now provide the requested information to defendant's counsel, with or without a protective order, or it shall submit the information to the Court, *in camera,* accompanied by a memorandum stating any grounds for its continued objections to furnishing defense counsel with this information. After completion of such discovery, defendant will be provided an opportunity to renew her motion to dismiss on the selective prosecution ground.

SO ORDERED.

The Clerk of Court is directed to forward copies of this Memorandum and Order to counsel for the parties.